[L.A. No. 31561. Feb. 7, 1983.]

WESTSIDE COMMUNITY FOR INDEPENDENT LIVING, INC., et al., Plaintiffs and Respondents, v.
MARIO G. OBLEDO, as Secretary, etc., Defendant and Appellant.

COUNSEL

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, Floyd D. Shimomura and William F. Soo Hoo, Deputy Attorneys General, for Defendant and Appellant.

Stanley Fleishman for Plaintiffs and Respondents.

Fred Okrand, Terry Smerling, Paul L. Hoffman, Dale L. Gronemeier and Abouaf, Epstein, Myers & Gronemeier as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

BIRD, C. J.—Did the trial court in this case abuse its discretion in granting attorney fees to plaintiffs pursuant to Code of Civil Procedure section 1021.5?

## I.

Section 11135 of the Government Code bars any program or activity funded by the state from unlawfully discriminating against any person "on the basis of ethnic group identification, religion, age, sex, color, or physical or mental disability."[1] Section 11139.5 directs defendant, the Secretary of the Health and Welfare Agency, to "establish standards for determining which persons are protected by [§ 11135] and guidelines for determining what practices are discriminatory."[2] Both of these statutes were enacted in September of 1977. (See Stats. 1977, ch. 972, § 1, pp. 2942-2943.)

On November 8, 1979, plaintiffs filed a petition for writ of mandate in the superior court, asking the court to order defendant to issue final regulations implementing section 11135. The petition alleged that defendant's failure to issue such regulations constituted a violation of section 11139.5.

Defendant filed an answer on December 12, 1979, in which he acknowledged that he had not as yet issued final regulations, but asserted that he was in the process of formulating regulations. He denied that he had failed to comply with section 11139.5 or had been dilatory in developing regulations.[3]

The declaration of William Wilder, special assistant to defendant Obledo, was attached to the answer. Wilder said he was in charge of drafting regulations to comply with section 11139.5. He stated that on September 7, 1979, 2 months before the petition for writ of mandate was filed, a 63-page draft of proposed regulations was submitted to defendant for approval.[4] Defendant approved the

---

[1] All statutory references are to the Government Code, unless otherwise noted.

[2] Section 11139.5 reads in full as follows: "The Secretary of the Health and Welfare Agency, with the advice and concurrence of the Fair Employment Practices Commission, shall establish standards for determining which persons are protected by this article and guidelines for determining what practices are discriminatory. The secretary, with the cooperation of the Fair Employment Practices Commission, shall assist state agencies in coordinating their programs and activities and shall consult with such agencies, as necessary, so that consistent policies, practices, and procedures are adopted with respect to the enforcement of the provisions of the article."

[3] Respondent also asserted that mandamus was improper because petitioners had not exhausted their administrative remedies pursuant to former sections 11426-11427 (currently §§ 11347-11347.1). In light of the resolution of this appeal, this issue need not be reached at this time.

[4] Wilder also provided a detailed chronology of defendant's actions during the time period between passage of sections 11135-11139.5 and the completion of the draft regulations. In particular, Wilder asserted that for almost a year after the passage of the statutes, defendant attempted to secure funding from the Legislature to hire staff to implement section 11139.5. When it became clear that such funding would not be provided, defendant directed existing staff members to develop proposed regulations. Those staff members began work in November of 1978. Their proposals were delayed some months while they awaited federal approval of parallel regulations. In September of 1979 they completed the draft which was submitted to defendant.

draft regulations on October 24, 1979, approximately two weeks before the lawsuit was filed, and gave authorization to proceed with their finalization and adoption.

Defendant's answer also asserted that the court had no authority to order issuance of *final* regulations, because (1) the former Administrative Procedure Act (former §§ 11371-11445; see current § 11340 et seq.) required notice to the public and public hearings before the proposal was adopted; (2) section 11139.5 required the "concurrence" of the Fair Employment Practices Commission; and (3) former Health and Safety Code section 18903 might require that the proposed regulations be submitted to the State Building Standards Commission for its approval. (See current Health & Saf. Code, § 18930.)

Wilder's declaration stated that the procedures mandated by the Administrative Procedure Act were already underway.

On December 14, 1979, at a superior court hearing on the petition for writ of mandate, defendant told the court that the draft regulations would be released to the public in January. The trial court continued the hearing until January 30, 1980.

Prior to the January court hearing, defendant released the proposed regulations to the public and filed a copy with the trial court. Defendant also informed the trial court that he planned to complete hearings on the regulations by the end of May of 1980 and issue the regulations in early June. Another court hearing was scheduled for June 2, 1980.

One week later, on February 7, plaintiffs filed a notice of motion for attorney fees under Code of Civil Procedure section 1021.5 (hereafter, section 1021.5), the private attorney general statute. In March, the trial court ordered defendant to pay attorney fees of $10,870. Defendant filed a notice of appeal from the attorney fee award.

Prior to the June 2, 1980, hearing, defendant informed the court that the regulations would be issued by the end of June. The court issued an alternative writ of mandate which ordered him to issue regulations by June 30, 1980, or show cause why he had failed to do so. Final regulations were issued on June 24, 1980.

In July of 1980, plaintiffs requested supplemental attorney fees. The trial court awarded additional fees of $1,538 in September of 1980. Defendant appealed from this award, and the two appeals were consolidated.

## II.

Section 1021.5 provides in pertinent part, "Upon motion, a court may award attorneys' fees to a successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

■ Defendant argues that there is no evidence in the record to support the trial court's conclusion that plaintiffs were a "successful party" in this action, or that the lawsuit "resulted in" the enforcement of a right. He points first to the fact that the lawsuit never reached a final judgment. However, past cases from both this court and the federal courts demonstrate that an attorney fee award may be justified even where a plaintiff's legal action does not lead to a favorable final judgment.[5]

For example, in *Northington v. Davis* (1979) 23 Cal.3d 955 [154 Cal.Rptr. 524, 593 P.2d 221], the defendant city claimed that it altered its plans "voluntarily" shortly after the plaintiff's lawsuit was filed. The city argued that this alteration should not be considered a "benefit" achieved by the lawsuit. (*Id.*, at p. 960, fn. 2.) This court disagreed, holding that an attorney fee award may be based on such a "voluntary" change, where it is a result of plaintiff's legal action. "[P]rior authorities make it clear that 'voluntary' corrective action, induced by litigation, may properly be considered a 'benefit' of the litigation in determining the propriety of an attorney fee award. [Citations.]" (*Ibid.*)

In *Fletcher v. A.J. Industries, Inc.* (1968) 266 Cal.App.2d 313, 325 [72 Cal.Rptr. 146], cited with approval in *Northington,* the Court of Appeal upheld an attorney fee award in an action that was resolved through a settlement. The court held that "[i]t was not significant that the 'benefits' found were achieved by settlement of plaintiffs' action rather than by final judgment." (*Ibid.*)

Numerous federal decisions have reached the same conclusion, holding that attorney fees may be proper whenever an action results in relief for the plaintiff, whether the relief is obtained through a "voluntary" change in the defendant's conduct, through a settlement, or otherwise. (See, e.g., *Sullivan v. Com. of Pa. Dept. of Labor, etc.* (3d Cir. 1981) 663 F.2d 443, 447-450; *Robinson v.*

---

[5]Section 1021.5 codified the common law theory of the private attorney general. The Legislature relied heavily on federal precedent when enacting the statute, and California courts often look to federal decisions when interpreting it. (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 934, 938 [154 Cal.Rptr. 503, 593 P.2d 200].)

*Kimbrough* (5th Cir. 1981) 652 F.2d 458, 465-466; *American Constitutional Party* v. *Munro* (9th Cir. 1981) 650 F.2d 184, 187-188.)

Thus, an award of attorney fees may be appropriate where "plaintiffs' lawsuit was a *catalyst* motivating defendants to provide the primary relief sought . . . ." (*Robinson, supra*, 652 F.2d at p. 465, italics added.) A plaintiff will be considered a "successful party" where an important right is vindicated "by activating defendants to modify their behavior." (*Ibid.*)

However, in order to justify a fee award, there must be a causal connection between the lawsuit and the relief obtained. Thus, in *Northington*, this court found that the defendant's "voluntary" action was "induced by" the plaintiff's legal action. (*Northington* v. *Davis, supra*, 23 Cal.3d at p. 960, fn. 2.) And in *Fletcher*, the settlement was clearly a result of the plaintiff's lawsuit. (*Fletcher* v. *A.J. Industries, Inc., supra*, 266 Cal.App.2d at p. 325.) The federal decisions have required that a plaintiff's action be a "material" factor or have "contributed in a significant way" to the result achieved. (*Sullivan, supra*, 663 F.2d at pp. 447-450; *Robinson, supra*, 652 F.2d at pp. 465-466; *American Constitutional Party, supra*, 650 F.2d at pp. 187-188.)

Where there is no causal connection between the plaintiff's action and the relief obtained, an attorney fee award is not proper. "[N]o award is required if the court determines that plaintiff's suit was completely superfluous in achieving the improvements undertaken by defendants on plaintiff's behalf." (*Nadeau* v. *Helgemoe* (1st Cir. 1978) 581 F.2d 275, 281.) In *American Constitutional Party, supra*, 650 F.2d at page 188, the court rejected a claim for attorney fees, finding that the plaintiffs had introduced no evidence demonstrating that their lawsuit had played a "causal role" in achieving the result they sought.

Defendant here argues that plaintiffs' lawsuit was "completely superfluous," with no causal connection to defendant's action, the issuance of final regulations implementing section 11139.5. This argument is well taken. The record demonstrates that at the time the lawsuit was filed, defendant had already approved a final draft of the proposed regulations. Statutory requirements mandated a lengthy process of consultation with other state agencies, notice to the public, and public hearings before the proposals could be finalized. Defendant stated in December, in his answer to the petition, that he intended to proceed with the statutorily mandated procedures in an expeditious manner, and he did so. Quite simply, there is no evidence in the record to indicate that the issuance of final regulations occurred even a day earlier than it otherwise would have as a result of plaintiffs' lawsuit.

Plaintiffs repeatedly point to the long delay between the passage of section 11139.5 and the adoption of final regulations, over two and one-half years later. However, this delay is largely irrelevant to this case. Plaintiffs' action was filed in November of 1979, more than two years after the statute was enacted. At that time, defendant had completed a draft of the proposed regulations. The major "logjam" assertedly preventing implementation of section 11139.5—the lack of funding—had already been resolved. The issue here is not the cause of the prior delay, but whether there was any causal connection between the lawsuit and the adoption of final regulations eight months later. Nothing in the record demonstrates any such connection.[6]

Were there any evidence in the record to support the trial court's order, this court would be reluctant to reverse that order on appeal. However, when faced with no basis in the record for the trial court's holding, how can this court properly give deference? In general, it is the task of the trial court to "realistically assess the litigation and determine, from a practical perspective,

---

[6]The dissenting opinion's assertion that plaintiffs' lawsuit induced defendant to accelerate the process of issuing the final regulations has no support in the record. The dissent notes that the study of the fiscal impact of implementing the regulations was completed before February 13, 1980, sooner than the late-March or early-April date originally contemplated by defendant. Based on this fact, the dissent asserts, "it is clear" that defendant had acclerated the promulgation process because of the lawsuit. (Dis. opn., at p. 356.)

What makes this so "clear" is neither apparent nor explained in the opinion. Nothing in the record even suggests the existence of a causal relationship between the lawsuit and the expedited financial study. Indeed, other explanations for the early completion of the evaluation are just as plausible. After establishing the original plan, defendant may have found that a lengthy and complex study was unnecessary because implementation of the regulations would have no direct fiscal consequences. The dissent's conclusion that plaintiffs' lawsuit caused the fiscal study to be accelerated is based on sheer speculation.

Furthermore, awarding attorney fees to plaintiffs on the basis of the expedited fiscal study would have detrimental consequences for the public in future lawsuits involving similar causes of action against public agencies. Once an agency was sued, it would refrain from taking any steps that it would normally take to accelerate the promulgation process, for fear that its actions would be perceived by the court as having been induced by the litigation. To avoid the possibility of having to pay attorney fees, the agency would strictly adhere to the original timetable that it had set for completing its work. This would deprive the public of the benefit to be gained from a speedier promulgation of the regulations.

In footnote 2, the dissent lists several other facts which assertedly support its contention. (See dis. opn., at p. 356, fn. 2.) It points out that at the hearing of December 14, 1979, defendant was ordered to advise the court of the date on which the final regulations would be issued. However, there is no evidence that the June 2d date announced by defendant was any earlier than the date that otherwise would have been set had the lawsuit not been filed.

The footnote also notes that prior to June 2d, defendant informed the court that he would not be able to have the final regulations issued by that day. How this fact supports the "catalyst" argument advanced by the dissent is unclear.

Finally, the dissent emphasizes that defendant did not actually promulgate the final regulations until after the court issued an alternative writ ordering him to do so by June 30th. What the opinion overlooks is that prior to the issuance of the writ, defendant had already informed the court that he planned to release the regulations prior to the end of June. The dissent's argument necessarily assumes that if the writ had not been issued, defendant would have exceeded the deadline he had set for himself. Nothing in the record provides a basis for this assumption.

whether or not the action served to vindicate an important right . . . ." (*Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at p. 938.)

■ Nevertheless, trial court discretion is not unlimited. "The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]" (6 Witkin (2d ed. 1971) Appeal, § 244, p. 4235; *Martin* v. *Cook* (1977) 68 Cal.App.3d 799, 807 [137 Cal.Rptr. 434]; *Frank E. Beckett Co.* v. *Bobbitt* (1960) 180 Cal.App.2d Supp. 921, 927-928 [4 Cal.Rptr. 833].)

■ Here, there is no reasonable basis for the trial court's award of attorney fees to plaintiffs.[7] Therefore, the orders awarding attorney fees to plaintiffs are reversed.

Richardson, J., Kaus, J., and Brown (Gerald), J.,* concurred.

**BROUSSARD, J.**—I respectfully dissent. The facts clearly indicate that this lawsuit acted as a catalyst by speeding up the process of issuance of the final regulations.

Sections 11135 and 11139.5 of the Government Code were enacted in September of 1977; yet, two years later, when this lawsuit was instituted, only proposed regulations had been drafted. No dates had been set for public hearings; no date had been set for issuance of final regulations; indeed, the proposed regulations themselves had not yet been issued. There were plans to send questionnaires to various agencies in January for the purpose of further prolonged study of the fiscal cost of the regulations that would have taken a minimum of 12 weeks to complete, after which at least 30 days would have been necessary to notice public hearings; in addition, respondent planned to seek the concurrence of the State Building Standards Commission—a complex process which would have taken a long, if not inordinate, period of time.

In contrast, only one month after the initiation of this lawsuit, the trial court ordered respondent to advise it by January 30, 1980, of a date when the final

---

[7]If this court were to award plaintiffs attorney fees in the present case, it would have to ignore the requirement of section 1021.5 that the lawsuit "*resulted* in the enforcement of an important right" that benefited the public. (Italics added.) This court's disregard for this legislatively mandated prerequisite might well lead the Legislature to withdraw all authority for granting attorney fees to successful public-interest litigants. Thus, contrary to the assertion of the dissenting opinion, today's decision will help to ensure "the future of public interest litigation." (See dis. opn., at p. 358.)

*Assigned by the Chairperson of the Judicial Council.

regulations would be issued. Just prior to the January court hearing, respondent issued the proposed regulations and notified the court that public hearings would be completed by the end of May.[1] On February 13, 1980, respondent published a Notice of Proposed Adoption of Regulations, which listed dates in April for public hearings to be held in Los Angeles, Fresno, San Francisco and Sacramento. The final paragraph of the notice read: "The Secretary of the Health and Welfare Agency has determined that the above regulations will have no direct costs or savings to state agencies or increased or new costs to local government pursuant to Section 2231 of the Revenue and Taxation Code. The building standards contained in the above regulations are hereby noticed for public hearing with the concurrence of the State Building Standards Commission." This is in direct contrast to respondent's original plan, under which the cost evaluation would not have been completed until at least late March or early April, after which public hearings would have been noticed and the concurrence of the commission obtained. Thus, it is clear that respondent indeed had accelerated the promulgation process.

At the January 30 trial court hearing, respondent advised the court that final regulations would be issued by June 2, 1980. The trial court decided to continue the matter until such time. When it became apparent that respondent was not going to meet the June 2 deadline, the trial judge issued an alternative writ of mandate to either issue the final regulations by June 30, or show cause why the regulations should not issue. Respondent issued the final regulations on June 24, 1980.[2]

As the majority recognizes, " 'voluntary' corrective action, induced by litigation, may properly be considered a 'benefit' of the litigation in determining the

---

[1]The declaration of William Wilder, which respondent filed immediately prior to the December trial court hearing, did not indicate that respondent planned to publicly issue the proposed regulations in January. A close reading of the declaration reveals only that a draft of the proposed regulations was to be included in the questionnaire package that was to be sent to various agencies for purposes of fiscal analysis of the regulations. Obviously, such an analysis could not be accomplished without a reading of the proposed regulations by the agencies.

[2]The majority argues that since respondent informed the trial court that final regulations would be released by the end of June prior to the issuance of the alternative writ, the writ did not prod him into speeding up the process. (See maj. opn., p. 354, fn. 6, *ante.*) Not only has the majority misstated the facts (see text accompanying this footnote), it has also ignored the realities of this case. The facts remain that respondent did not set any date for the issuance of final regulations until ordered to do so by the trial court; before an alternative writ was issued, respondent acknowledged that there would be a delay in issuing the regulations; respondent did not actually issue the regulations until the trial court ordered him to do so in the alternative writ. These facts, coupled with the history of previous delays in the entire promulgation process, clearly indicate that respondent would not have issued the final regulations had petitioners not initiated this lawsuit and successfully convinced the trial court to issue an alternative writ of mandate.

propriety of an attorney fee award. [Citations.]" (*Northington* v. *Davis* (1979) 23 Cal.3d 955, 960, fn. 2 [154 Cal.Rptr. 524, 593 P.2d 221]; see maj. opn. at p. 352 above.) Petitioners are entitled to attorneys' fees if there is a causal connection between their suit and respondent's actions. (See, e.g., *Sullivan* v. *Com. of Pa. Dept. of Labor* (3d Cir. 1981) 663 F.2d 443; *Morrison* v. *Ayoob* (3d Cir. 1980) 627 F.2d 669, cert. den. (1981) 449 U.S. 1102 [66 L.Ed.2d 828, 101 S.Ct. 898]; *Ross* v. *Horn* (3d Cir. 1979) 598 F.2d 1312; *Young* v. *Kenley* (4th Cir. 1981) 641 F.2d 192; *Smith* v. *University of North Carolina* (4th Cir. 1980) 632 F.2d 316; *Robinson* v. *Kimbrough* (5th Cir. 1981) 652 F.2d 458; *Harrington* v. *DeVito* (7th Cir. 1981) 656 F.2d 264; *United Handicapped Federation* v. *Andre* (8th Cir. 1980) 622 F.2d 342; *Chicano Police Officer's Assn.* v. *Stover* (10th Cir. 1980) 624 F.2d 127; *Foster* v. *Boorstin* (D.C. Cir. 1977) 561 F.2d 340; *Cuneo* v. *Rumsfeld* (D.C. Cir. 1977) 553 F.2d 1360.)

The majority errs, unfortunately, in its vain search for specific evidence in the record to identify the "causal" connection, such as an affidavit or statement by the respondent that the lawsuit induced him to speed up the process. Such an affidavit, however, is simply unnecessary here. The trial judge, after considering the totality of the circumstances, was quite able to make a determination that a causal connection in fact existed. This judge sat through the entire proceedings from their very beginning; he listened to both parties testify, and read the various pleadings. He had the opportunity to observe the demeanor of the respondent at the hearings. He asked for a date of final issuance which had not been set, and the respondent responded by setting the date. Thereafter, at least two months earlier than respondent had planned, respondent noticed public hearings to be held in April. Thereafter, when further delay was evident, the trial judge ordered that the final regulations be issued by June 30, and the respondent responded by issuing them. It was thus quite reasonable for the trial judge to conclude that respondent had felt compelled to hasten the process of issuing final regulations.

Furthermore, there is no evidence to the contrary. Respondent has not shown that he would have set a June date for final issuance had there been no hearing in January, nor that he would have noticed public hearings as early as February, nor that he would have actually issued the final regulations in June had no alternative writ of mandate been issued. He showed no evidence of other forces as his motivation for acting so swiftly. He alone had control over information explaining his actions—he, rather than petitioners, should have borne the burden of going forward with evidence to prove that the lawsuit did not act as a catalytic factor. (Cf. *Nadeau* v. *Helgemoe* (1st Cir. 1978) 581 F.2d 275, 281 (the inference drawn from the chronological sequence of events is stronger when evidence of defendant's behavior is under defendant's control).) Therefore, the only reasonable conclusion to be drawn is that the lawsuit, and

the subsequent orders of the trial judge, compelled respondent to act. Thus, the lawsuit indeed acted as a catalyst in speeding up the promulgation process.

At issue today is the future of public interest litigation such as that at bar which has benefited handicapped people throughout the State of California. Our private attorney general statute was passed to ensure that attorneys would remain motivated to prosecute cases in the public interest. "[P]rivately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and . . . without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200].) Our policy therefore should be to encourage, rather than discourage, public litigation suits. To do so, we must allow a trial judge to make reasonable inferences from his or her perception of the totality of the proceedings before him or her, and to independently assess the catalytic effect of the proceedings on defendants. Requiring some kind of documental or testimonial proof of a causal connection only serves to deeply and impermissibly penetrate into the realm of discretion of the trial judge. I would therefore give great deference to a trial judge's finding of a causal connection, and would find no abuse of discretion absent concrete evidence by respondent that other factors, rather than the lawsuit, prodded him into speeding up the process. I would therefore uphold the award of attorneys' fees in this case.

Mosk, J., and Reynoso, J., concurred.