[No. A041631. First Dist., Div. Four. June 23, 1989.]

CALIFORNIANS FOR RESPONSIBLE TOXICS MANAGEMENT, Plaintiff and Appellant, v.
KENNETH KIZER, as Director, etc., Defendant and Appellant.

COUNSEL

Khourie, Crew & Jaeger, Michael N. Khourie, James G. Gilliland, Jr., Richard L. Grossman, Mark T. Jansen, Greve, Clifford, Diepenbrock & Paras and Scott R. Keene for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Charlton G. Holland, Assistant Attorney General, Stephanie Wald and Asher Rubin, Deputy Attorneys General, for Defendant and Appellant.

OPINION

POCHÉ, J.—Defendant Kenneth Kizer, the Director of the California Department of Health Services (Department), appeals an attorneys' fee award (Code Civ. Proc., § 1021.5)[1] of $97,675.50 to plaintiff, Californians for Responsible Toxics Management (CRTM), as successful party in a suit brought by CRTM as a private attorney general against the Department and the International Technology Corporation, Inc. (IT). CRTM cross-appeals from the fee award contending that it was too low.

CRTM, a conservation group organized as a California nonprofit corporation, filed a complaint for declaratory and injunctive relief in early April 1986 naming as defendants IT and Kenneth Kizer. CRTM sought in part to enjoin IT's alteration or expansion of its toxic waste facility in Benicia, as well as orders requiring IT to identify and remedy contamination at the site, and requiring the Department to withhold approval of the facility until IT was in full statutory compliance.

On June 6, 1986, IT Corporation and the Department entered into a consent order which required IT at the Benicia site to monitor its existing landfill, remedy leakage in a drum burial area, close certain inactive ponds, and post a bond of $277,500 to ensure its compliance. That order was superseded by a final consent order of July 8, 1986, setting forth essentially the same agreement.

After July 25 and August 1 hearings on the order to show cause CRTM's motion for a preliminary injunction was denied. The court's order states in part that it was "relying upon the protection provided during the pendency

_____

[1] Unless otherwise indicated, all further California statutory references are to the Code of Civil Procedure.

of this litigation by the July 8, 1986 Consent Order entered into between defendant Department of Health Services and defendant IT Corporation."

On October 3, 1986, CRTM filed a motion for summary judgment. The motion was denied by an order of January 2, 1987, in which the court concluded that the case presented a myriad of factual disputes involving two issues—first, "whether or not INTERNATIONAL TECHNOLOGY CORPORATION, INC. is making substantial modifications or additions to the facility in violation of *Health and Safety Code, Section 25200.5*" and second, "whether or not INTERNATIONAL TECHNOLOGY CORPORATION, INC. is violating the closure requirements of State and Federal governments."

CRTM's motion for reconsideration was denied by an order of May 7, 1987. It then moved for an award of $593,000 in attorneys' fees and costs pursuant to section 1021.5. Following a stipulation for dismissal of the underlying action, CRTM settled its attorneys' fees claim against IT for $38,000. The trial court made a fee award of $97,675.50 against the state, on the basis that CRTM's action had acted as a catalyst in speeding up issuance of the final consent order.

On appeal the Department contends that the trial court erred in concluding that CRTM was a "successful party" entitling them to a fee award under section 1021.5. Alternatively, the Department also argues that if any fee award against it was proper it must be limited to an award for time and costs directly related to issues involving the Department. By cross-appeal CRTM challenges the exclusion of certain items from the lodestar and the award of less than 100 percent of the lodestar sum.

## Discussion

Section 1021.5, which is a codification of the private attorney general doctrine, provides for an "award of attorneys' fees to a successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit . . . has been conferred on the general public . . ., (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (*Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 317 [193 Cal.Rptr. 900, 667 P.2d 704].)

■ Before a plaintiff may receive an award under section 1021.5 he must demonstrate a causal connection between his action and the relief achieved. (*Maria P.* v. *Riles* (1987) 43 Cal.3d 1281, 1291 [240 Cal.Rptr.

872, 743 P.2d 932]; *Westside Community For Independent Living, Inc.* v. *Obledo* (1983) 33 Cal.3d 348, 353 [188 Cal.Rptr. 873, 657 P.2d 365].) However, a plaintiff need not achieve a favorable final judgment in order to be a successful party. (*Id.* at p. 352.) A defendant's voluntary action induced by plaintiff's lawsuit will still support an attorneys' fee award on the rationale that the lawsuit spurred defendant to act or was a catalyst speeding defendant's response. (*Id.* at pp. 352-353.)

"The critical fact is the impact of the action, not the manner of its resolution." (*Folsom* v. *Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 685 [186 Cal.Rptr. 589, 652 P.2d 437].) How the party achieves success does not determine his right to fees, but the impact of his suit does. (*In re Head* (1986) 42 Cal.3d 223, 228-229 [228 Cal.Rptr. 184, 721 P.2d 65].)

If plaintiff's lawsuit "induced" defendant's response or was a "material factor" or "contributed in a significant way" to the result achieved then plaintiff has shown the necessary causal connection. (*Northington* v. *Davis* (1979) 23 Cal.3d 955, 960, fn. 2 [154 Cal.Rptr. 524, 593 P.2d 221]; *Westside Community For Independent Living, Inc.* v. *Obledo, supra,* 33 Cal.3d at p. 353; *California Common Cause* v. *Duffy* (1987) 200 Cal.App.3d 730, 743 [246 Cal.Rptr. 285].) The question of whether plaintiff's action is causally linked to achieving the relief obtained is a question of fact. (*Wallace* v. *Consumers Cooperative of Berkeley, Inc.* (1985) 170 Cal.App.3d 836, 845 [216 Cal.Rptr. 649].)

■ A fee award made under section 1021.5 is a discretionary act by the trial court, and the award is only reversed on appeal when there is no reasonable basis for it in the record. (*Westside Community for Independent Living, Inc.* v. *Obledo, supra,* 33 Cal.3d at pp. 349, 355.)

■ In its decision the court here concluded that CRTM was a successful party[2] because it had served as a catalyst. To establish the necessary causal connection between the CRTM lawsuit and the relief obtained the court looked to the chronology of events: "The consent decree of July 9,

---

[2] The decision conceded that this case had been dismissed but that the dismissal had occurred "only after a consent order was filed in another action which resolved the concerns of Plaintiffs herein." The other action to which the court refers is a complaint which was filed on April 1, 1987, by the Department against IT. That action was terminated by a consent decree approved on April 4, 1987, which included a fine against IT of some $3.2 million.

The record in that case is not before us, and apparently was not before the superior court. As a consequence we seriously question whether that action can be used to evaluate CRTM's success here. For the purpose of awarding attorneys' fees in this case CRTM may not take credit for all regulatory action taken by the Department against IT subsequent to April 1986 when CRTM filed its complaint.

1986 was not obtained until after the suit was filed. . . . Additional DEPARTMENT OF HEALTH SERVICES action [closure order of Dec. 12, 1986] appears to have been engendered by the unsuccessful Motion for Summary Judgment. It is reasonable to assume that the closure order and final consent decree came about more quickly in part because of the Plaintiff's action."

Obviously it can be difficult to prove causation where as here plaintiff seeks to recover on a catalyst theory. When action is taken by the defendant after plaintiff's lawsuit is filed the chronology of events may permit the inference that the two events are causally related. (*Leiserson* v. *City of San Diego* (1988) 202 Cal.App.3d 725, 736 [249 Cal.Rptr. 28].)

The Department argues that such an inference shifts the burden to defendant to offer rebuttal. Indeed, there is a line of authority in federal Freedom of Information Act cases which supports this view.[3] That act permits the recovery of attorneys' fees only when the plaintiff can show both that his suit was reasonably necessary and had a substantial causative effect upon his receiving the requested information. (*Vermont Low Income Advocacy Council, Inc.* v. *Usery* (2d Cir. 1976) 546 F.2d 509, 513 [36 A.L.R.Fed. 519].) Accordingly, cases have permitted such an inference from the chronology of events to stand where no rebutting evidence was offered by the defendant. (*Crooker* v. *United States Dept. of Justice* (1st Cir. 1980) 632 F.2d 916, 919; *Marschner* v. *Department of State, etc.* (D.Conn. 1979) 470 F.Supp. 196, 199.) Likewise, where the government has presented affidavits rebutting the presumption by showing that the agency was complying with the request and the filing of the suit had no impact upon its action, the inference of causation has been successfully rebutted. (*Kohn* v. *F.B.I.* (D.Mass. 1984) 581 F.Supp. 48, 49-50.) The approach followed in these federal cases is, we feel, a sensible one for evaluating whether a lawsuit has stimulated bureaucratic action.

Here the court seems to have relied solely upon the chronology of events. The Department submitted two declarations, one from Dwight Hoenig, the Department officer in charge of toxic substances control for the area in which the IT facility is located, and a second from John Allen, corporate counsel for IT.

According to these declarations in late May of 1986 IT was preparing a $60 million public bond offering. At the time IT was operating under an

---

[3] As our Supreme Court has noted, "[I]t is not our view that federal authority is of more than analogous precedential value in construing section 1021.5." (*Serrano* v. *Unruh* (1982) 32 Cal.3d 621, 639, fn. 29 [186 Cal.Rptr. 754, 652 P.2d 985].)

order from the Department which gave the company until June 6, 1986, to obtain additional liability coverage for its facilities in this state. Belatedly IT realized that it had no agreement from the Department to renew or extend the liability coverage order. Without the order the California IT facilities would be out of compliance and that fact would have had to be disclosed in the bond prospectus, with the result that the company would have had to offer the bonds at a higher interest rate.

With the bond offering as leverage the Department was able to get IT's agreement to the consent order of June 6, 1986, which was then superseded by the final order of July 8. Mr. Hoenig further stated that he had not learned of the CRTM complaint until June 3, 1986, *after* he had directed his staff to draft the requirements for what became the June 6 consent order.

CRTM submitted no affidavits bearing directly upon the question of whether the consent decrees were related to the institution of this suit. They did submit a declaration by Senator Barry Keene that "[p]rior to the filing of CRTM's action, I was not aware of any enforcement action that had been taken by [the Department]. I do not believe there was any predisposition by the Department to take any enforcement or compliance action prior to CRTM's suit." Similar sentiments were expressed in the declaration of Senator Art Torres, who, as Chairman of the Senate Committee on Toxics and Public Safety, was familiar with the history of the Department's regulatory efforts at IT.

In response to these declarations the court found the Department's " 'over the barrel' argument concerning the bond offering to be creative, but not very persuasive. In fact, the chronology of events is in favor of the Plaintiff's position."

We find this statement of decision somewhat puzzling. The court refers to the bond issue as an " 'over the barrel' *argument*" as if there were no *evidence* before it. Yet it had two declarations and supporting documents before it. Presumably the trial court chose to discount the Department's evidence as lacking in credibility. Credibility is properly the province of the trier of fact. (Evid. Code, § 312, subd. (b).) Here, however, it is not clear that the trial court considered, but discounted, the evidence about the genesis of the consent orders. Such evidence, if credible, would suffice to rebut the presumption of causation raised solely by the chronology of events.

Because the causation issue determines CRTM's right to *any* fee award, we are especially troubled by the ambiguity of the statement of decision.

Accordingly we remand to the trial court for specific findings on the issue of causation.

Fee Calculation

For the guidance of the trial court and in the interests of judicial economy we also reach additional issues raised on the appeal and those raised by the cross-appeal.

■ In determining a fee award under section 1021.5 the trial court must first determine a touchstone or lodestar amount based upon the time spent and the reasonable hourly compensation for each attorney. (*Maria P.* v. *Riles, supra,* 43 Cal.3d at p. 1294; *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 48 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*).) Once the lodestar amount is determined the court looks to a variety of other factors which may justify either the augmentation or the diminution of the lodestar sum. Among the factors properly considered by the trial court in *Serrano III* were: "(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved [and] (6) the fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed. . . . [Fn. omitted.]" (20 Cal.3d at p. 49.)

■ Although federal trial courts set forth in great detail the calculations used to fix a fee award, California law imposes no similar duty upon the trial court to justify every elimination of requested time. (*California Common Cause* v. *Duffy, supra,* 200 Cal.App.3d at p. 754.)

Here the trial court reduced the lodestar sum sought by CRTM by eliminating fees and costs attributable to CRTM's advocacy before and discovery from the Water Quality Control Board and for time spent with the media. With these reductions the lodestar sum was set at $279,072.86. CRTM contends in its cross-appeal that it was error to deduct these amounts from the lodestar.

In September 1986 the California Regional Water Quality Control Board issued a cleanup and abatement order to IT based on a finding that many of

its waste ponds were in danger of polluting the water supply. CRTM decided to contest that order and presented an appellate petition to the State Water Board in late October. CRTM contends that their challenge to the original order resulted in a July 1987 final order by the regional board which took strong measures and required closure of any leaking ponds. Because closure of improperly maintained ponds was one goal of their lawsuit, CRTM argues that it should be compensated for its efforts before the Water Board.

Also excluded from the lodestar was additional time spent by CRTM in deposing Water Board employees and in analyzing documents subpoenaed from the board. CRTM urged the trial court to permit compensation for these expenses on the ground that the fruits of this discovery were used by it not only before the board but in this case in support of its unsuccessful motions for a preliminary injunction and for summary judgment.

Relying on United States Supreme Court precedent (*Webb* v. *Dyer County Bd. of Education* (1985) 471 U.S. 234 [85 L.Ed.2d 233, 105 S.Ct. 1923]) this district has previously adopted the rule that an award under section 1021.5 for time spent in related administrative proceedings may properly constitute time reasonably expended in the action. (*Wallace* v. *Consumers Cooperative of Berkeley, Inc., supra,* 170 Cal.App.3d at pp. 848-849.)

In *Wallace* various consumer groups including a cooperative grocery store were enjoined by State Department of Food and Agriculture from selling milk below the minimum price. (*Wallace* v. *Consumers Cooperative of Berkeley, Inc., supra,* 170 Cal.App.3d at p. 841.) By cross-complaint they then challenged enforcement of the minimum price. (*Ibid.*) Before the case could come to trial the parties entered into a settlement providing that trial would be continued provided public hearings on the milk pricing issue were held before a certain date. (*Id.* at pp. 841-842.) The hearings were held and the consumer groups were awarded attorneys' fees for the time they spent in the administrative proceedings because the trial court found that the administrative action and the lawsuit were " 'intertwined inextricably.' " (*Id.* at p. 848.)

Here the trial court refused to permit CRTM to recover for fees and costs associated with the Water Board petition, concluding that the Water Board action "was totally unrelated to the direction taken by this lawsuit." The court also distinguished *Wallace* on the basis that in it "the administrative proceedings were actually conducted between the parties to the litigation."

The question is not whether the parties to the administrative action are the same parties involved in the lawsuit, but rather has the successful party

made the requisite showing that time spent in a related administrative proceeding was reasonably expended on the litigation because it was both useful and necessary and directly contributed to the resolution of the action. (*Webb* v. *Dyer County Bd. of Education, supra,* 471 U.S. at pp. 242-243 [85 L.Ed.2d at p. 242]; *Wallace* v. *Consumers Cooperative of Berkeley, Inc., supra,* 170 Cal.App.3d at pp. 848-849.)

We are not prepared to find that the trial court abused its discretion in excluding the water board work. The court implicitly found that the lawsuit and the petition were not so intimately linked as to be comparable to the situation in *Wallace*.[4]

The trial court also excluded from the lodestar costs related to document analysis and the taking of depositions and declarations from water board staff. The law firm of Khourie, Crew & Jaeger submitted a breakdown of hours attributable to such activity.[5] Information gained through this discovery was submitted in support of CRTM's unsuccessful motions.

CRTM argues that since discovery is normally a compensable item in a fee award (*Webb* v. *Dyer County Bd. of Education, supra,* 471 U.S. at p. 242 [85 L.Ed.2d at pp. 241-242]), the Khourie firm's hours were improperly excluded. We assume the trial court was cognizant of its ability to make an award for discovery. In viewing the record most favorably to the judgment we must infer that the trial court rejected CRTM's argument that the discovery was undertaken for this action, since after CRTM made its pitch for the time the court issued its final order eliminating that amount. That was a discretionary decision which this court declines to disturb.

Lastly, CRTM objects to elimination from the lodestar of $2,717.25 for hours spent with the media, which it characterizes as "public education efforts." While there may be cases in which public relations time is appropriately included in a lodestar, that decision is best made by the trial court which has a firsthand opportunity to evaluate the reasonableness of such an

---

[4] CRTM maintains that the language of the tentative decision indicates that the trial court erroneously believed that it lacked the discretion to award attorneys' fees for the Water Board action. If this were the case the error would be one of law.

It points specifically to the following language in the tentative decision: "The law does not appear to go so far as to *require* one state agency to pay for work involving another agency. This Court is not willing to go so far as to create a single agency, 'The State', and charge the Department of Health for all fees concerning it." (Italics added.) The court also noted that plaintiff had not named the water board as a defendant in this action.

While the language may be somewhat inartful, taken in context we believe the trial court was simply saying there was no close and causal connection between the administrative action and the outcome of this lawsuit.

[5] CRTM calculates this expense to be $5,033.83.

award. (See *California Common Cause* v. *Duffy, supra,* 200 Cal.App.3d at pp. 753-754 [time spent with the press properly eliminated from section 1021.5 award].) CRTM presents no compelling reason to find that exclusion of media time in this case was an abuse of discretion.

### Adjustment of Lodestar

■ Once the trial court determines the amount of the lodestar it adjusts that figure up or down depending upon a variety of factors. (*Serrano* v. *Priest, supra,* 20 Cal.3d at p. 49.) Here the trial court applied a fractional multiplier of 35 percent to the lodestar. It gave as its reasons for doing so "the fact that the impact of the lawsuit was lessened somewhat by the relative lack of success therein. A primary factor is that many other agencies, political entities and individuals contributed to the final result."

The court went on to note that defendant IT, "the primary 'culprit' " had already settled the attorneys' fee claim against it for $38,000. Concluding it would be "unconscionable to assess DEPARTMENT OF HEALTH SERVICES over 16 times the amount of fees" paid by IT, the court made the fractional adjustment and stated that the sum achieved "shall be over and above" that paid by IT.

Neither side is pleased with this result. The Department contends that it was improper to make an award except as some fraction (either 35 percent or some lesser amount appropriate for a catalyst) only of those hours in the lodestar which represent CRTM's time attributable to Department issues. CRTM in its cross-appeal argues that reducing the award to 35 percent of the lodestar was improper because it was arbitrary, because the Department failed to meet its burden to show the lodestar was not a reasonable and proper fee, and because the factors relied upon by the trial court are not appropriately considered under *Serrano* v. *Priest, supra,* 20 Cal.3d at p. 49.

In *Serrano III* our Supreme Court set out a list of some seven factors which it found the trial court had properly considered in deciding whether to adjust the lodestar up or down. (*Serrano* v. *Priest, supra,* 20 Cal.3d at p. 49.) In its subsequent decisions the Supreme Court has referred to the *Serrano III* factors in language which makes it clear that they are not an exclusive list. For example, "The [lodestone] figure may be enhanced or diminished after the court considers matters *such as* those enumerated in *Serrano III* . . . ." (Italics added.) (*Serrano* v. *Unruh, supra,* 32 Cal.3d 621, 626, fn. 6.) Or, "In *Serrano III,* this court listed a number of relevant factors the trial court *may consider* in adjusting the lodestar . . . ." (Italics added.) (*Maria P.* v. *Riles, supra,* 43 Cal.3d at p. 1294, fn. 8.)

CRTM maintains that the trial court erred under California law by looking to the relative lack of success of its suit as a factor justifying reduction of the lodestar. They rely on *Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d 311. *Press* involved a petition drive to obtain the signatures necessary to place an initiative on the state election ballot. (*Id.* at p. 316.) When the drive's sponsors were ordered away from a Lucky supermarket they successfully obtained an injunction permitting their return. (*Ibid.*) The trial court found plaintiffs were successful parties under section 1021.5, but reduced the fee award requested (lodestar enhanced by a factor of 1.5) by a fraction reflecting the ratio of signatures from that one Lucky store to the total number of signatures collected statewide. (*Id.* at p. 317.) Thus, on a fee request of $20,940 plaintiffs were awarded only $112.98. (*Id.* at pp. 316-317.)

The Supreme Court remanded the award for redetermination under a proper lodestar analysis—rejecting the trial court's use of its own "arbitrary formula." (*Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d at p. 322.) We do not read the case, however, to reject lack of success as an appropriate adjustment factor. *Press* stands for the proposition that the *Serrano III* lodestar analysis must be followed and that *Serrano III* objectives are not met "[i]f there is no reasonable connection between the lodestar figure and the fee ultimately awarded." (*Id.* at p. 324.)

Nor are the federal cases CRTM cites especially helpful here. In *Gekas* v. *Atty. Registration & Disciplinary Comm'n.* (7th Cir. 1986) 793 F.2d 846, the circuit court vacated and remanded a fee award which the trial court had reduced on the basis that to award the full lodestar amount would simply encourage further litigation. (*Id.* at p. 853.) Obviously, this was an impermissible factor since it would defeat the very purpose of making fee awards to successful litigants. (*Ibid.*) In *Quesada* v. *Thomason* (9th Cir. 1988) 850 F.2d 537, the circuit court reversed and remanded where the trial court had erred in finding that plaintiff had not achieved a good result. (*Id.* at pp. 539, 543.)

In federal cases once the court has determined that a plaintiff is the prevailing party and is eligible for a fee award, the inquiry shifts to what a reasonable fee will be. As the United States Supreme Court has noted in the context of fee awards under federal civil rights statutes, " 'the range of possible success is vast,' and the achievement of prevailing party status alone 'may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved.' " (*Texas State Teachers Assoc.* v. *Garland Independent School Dist.* (1989) 489 U.S. 782, __ [103

L.Ed.2d 866, 876, 109 S.Ct. 1486, 1492], quoting *Hensley* v. *Eckerhart* (1983) 461 U.S. 424, 436 [76 L.Ed.2d 40, 52, 103 S.Ct. 1933].)

Absent the existence of California authority for the proposition that it is improper to consider lack of success as a lodestar adjustment factor, we are not prepared to say that the trial court here erred in doing so. Plaintiff did not succeed on any of its motions. Likewise the court made the factual finding that the result achieved was contributed to by "many other agencies, political entities and individuals."

Because plaintiff's claims probably cannot be easily segregated into successful and unsuccessful ones to which hours can easily be attributed (see *Hensley* v. *Eckerhart, supra,* 461 U.S. at pp. 434-436 [76 L.Ed.2d at pp. 50-52]), the trial court's assessment does not lend itself to a single mathematical calculation. We cannot say that a 35 percent fractional multiplier is arbitrary or bears "no reasonable connection between the lodestar figure and the fee ultimately awarded." (*Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d at p. 324.)[6]

## Apportionment

■ Finally, CRTM challenges the trial court's consideration of its settlement with IT. Specifically the court's finding that it would be unconscionable to assess the Department 16 times the amount of IT's settlement. The tentative decision is not clear on this point. It can be read to hold that the lodestar amount is being reduced to a fractional recovery *because* IT, the more culpable party, had already settled for $38,000 and the court wished to maintain some equivalence between the culpability of the two defendants and their fee responsibility. If that is the reasoning of the court it is erroneous.

The public policy which stands behind section 1021.5 is defeated if the trial court looks to the amount of the settlement of the more culpable party and then seeks to reduce the plaintiff's fee award so that a nonsettling defendant is not punished out of proportion to his culpability. Such a rule would permit a settling defendant who is more culpable to effectively place a cap on plaintiff's total fee award. While such a result is perhaps fair as between the defendants, it subverts the very purpose of section 1021.5

---

[6]CRTM complains that it did offer proper enhancement factors, that is, some specifically enumerated in *Serrano III,* which the trial court did not mention. We assume that the trial court's failure to mention these factors was a determination that those factors were not applicable here.

which is to recompense plaintiffs who benefit the public by successfully undertaking such litigation.

The Department is also distressed by the amount of the award, but it objects that any fee award should be apportioned or, better yet, calculated so that the Department pays only for that portion of plaintiff's time which was devoted to litigating against it and not for plaintiff's time spent against IT.

In connection with the IT-CRTM settlement all the parties entered into a good faith settlement stipulation. As part of that stipulation the Department set out its position that it had no liability to CRTM for attorneys' fees. The stipulation then states: "With respect to plaintiff's motion for fees, the Court must first find whether plaintiff is entitled to an award. If the Court finds that plaintiff was a catalyst for relief, the Court must decide how the award would have been apportioned between defendant Kizer and IT."

Apportionment may certainly be appropriate where there is more than one defendant. For example in *Sundance* v. *Municipal Court* (1987) 192 Cal.App.3d 268 [237 Cal.Rptr. 269], a successful challenge to the prosecution of public inebriates supported a fee award made equally against the City and County of Los Angeles. (*Id.* at p. 272.) On appeal the county challenged this 50/50 allocation arguing it had committed fewer of the abuses corrected by the lawsuit and therefore it should not pay as much as its more culpable codefendant, the city. (*Ibid.*) The appellate court upheld the apportionment, noting that the county had taken "an active part in opposing the litigation and thus in generating the expenses that are compensated by the award of attorneys' fees." (*Ibid.*)

It is certainly reasonable, given the facts of a specific case, for a court to apportion a fee award based upon the relative culpability of the parties. (*Grendel's Den, Inc.* v. *Larkin* (1st Cir. 1984) 749 F.2d 945, 959-960 [reversing 50/50 award to 25 percent and 75 percent]; *Jose P.* v. *Ambach* (2d Cir. 1982) 669 F.2d 865, 871 [upholding fee award 80 percent borne by city and 20 percent borne by state].)

The Department, however, misreads California law when it says that one defendant may not be charged for work attributable to another. It relies upon *County of San Luis Obispo* v. *Abalone Alliance* (1986) 178 Cal.App.3d 848 [223 Cal.Rptr. 846], for this proposition. In *Abalone Alliance* the county and other plaintiffs brought an action naming as defendants various groups and individuals who had demonstrated against a nuclear power plant. (*Id.* at pp. 856-857.) After a demurrer the county's claim was

dismissed, while the other plaintiffs were given leave to amend. (*Id*. at p. 855.) In awarding attorneys' fees the trial court reduced the lodestar request of some $146,000 to $75,000 reasoning that the lesser amount represented time reasonably spent opposing the county. (*Id*. at p. 870.) The court noted that defendants had not yet achieved complete success—there were still plaintiffs in the suit—and acknowledged that if defendants eventually prevailed against those remaining plaintiffs an additional fee award against them would not be precluded. (*Ibid*.)

*Abalone Alliance* is readily distinguishable from the problem before us. It was an ongoing case in which there were still parties against whom defendants might or might not be successful. Thus, until the remainder of the case was resolved it was impossible to say that as against those remaining plaintiffs defendants even qualified for a fee award as successful parties for the purposes of section 1021.5. In contrast here the case had been dismissed and one defendant had settled before the question of attorneys' fees was before the court.[7]

Defendant IT settled with plaintiff while the Department chose to contest its fee liability. The Department had an opportunity to challenge the good faith of the IT settlement. (§ 877.6.) It did not do so. Having made that tactical decision it cannot now complain that it is liable to pay more than its fair share of the attorneys' fees award.

We remand in order for the trial court to make findings on the issue of causation, specifically: Was the April 1987 resolution of another action by the Department against IT causally related to this lawsuit? Is the presumption of causation raised by the chronology of events rebutted by the evidence that the July 1986 consent decree in this action was unrelated to CRTM's lawsuit? The trial court must also reexamine the fee award made against the Department in light of our ruling that it may not fix the amount of that award by reference to the amount of IT's settlement with plaintiff.

---

[7] The only case the Department cites which involves settling and nonsettling defendants is *Decker* v. *United States Dept. of Labor* (E.D.Wis. 1983) 564 F.Supp. 1273. *Decker* involved a number of defendants: counties, county officials and the U.S. Labor Department, as well as intervener church defendants. The district court first excluded from the statements of time spent, hours which were attributable to settling defendants and hours spent reaching settlement with them.

Obviously the trial court here might have given a very precise list of exactly which hours it felt plaintiffs had expended solely on IT related matters and which hours were solely chargeable to settlement with IT and excluded them from the lodestar calculation. It did not do so. Whether such precise allocation of time is appropriate or possible in a given case will turn on the posture of the case and the nature of the claims against the various defendants. We cannot say that the court's failure to fine tune the lodestar was an abuse of discretion, however, where the court then reduced the lodestar by some 65 percent.

### Additional Fees

CRTM asks that this court award it attorneys' fees for preparing its fee petition in the lower court and for defending its award on appeal. ■ "[A]bsent circumstances rendering the award unjust, fees recoverable under section 1021.5 ordinarily include compensation for all hours reasonably spent, including those necessary to establish and defend the fee claim." (*Serrano* v. *Unruh, supra,* 32 Cal.3d at p. 639.)

Because we are remanding this case to the trial court we direct it, should it conclude in accordance with the issues decided on remand that a fee award to plaintiff is authorized, to determine a fee award to plaintiff for the prosecution of its fee petition and for those hours expended solely as a respondent to the Department's appeal. Because CRTM has not prevailed on its cross-appeal it is not entitled to an award for fees and costs attributable to that cross-appeal. (Cal. Rules of Court, rule 26.)

We remand for further proceedings consistent with this opinion.

Anderson, P. J., and Perley, J., concurred.