Filed 3/5/13  In re A.G. CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | H038632 (Santa Clara County Super. Ct. No. JD19418) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　　　v.<br><br>I.L.,<br><br>　　　　Defendant and Appellant. | |

## I.  STATEMENT OF THE CASE

I.L., the mother of A.G., the child at issue in this case, appeals from an order terminating her parental rights under Welfare and Institutions Code section 366.26.[1]  She claims the court erred in declining to apply the beneficial parental relationship exception to avoid terminating her parental rights.  (§ 366.26, subd. (c)(1)(B)(i).)

We find no error and affirm the termination order.

---

[1] All unspecified statutory references are to the Welfare and Institutions Code.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### Protective Custody for A.G.

A.G. was born in January 2009. She tested positive for methamphetamine and amphetamine, displayed symptoms of drug withdrawal, and stopped breathing. After being resuscitated, she was placed in the neo-natal intensive care unit, and an emergency response social worker immediately placed her in protective custody.

### The Petition and Detention Hearing

On January 16, 2009, the Santa Clara County Department of Family and Children's Services (the Department) filed a dependency petition for A.G. alleging that she was at risk due to mother's failure and inability to protect and provide regular care for her. (§ 300, subd. (b).) In addition to describing A.G.'s condition at birth, the petition alleged that mother had failed to seek prenatal care and not sought treatment for her own gestational diabetes, which put A.G. at risk *in utero*. The petition further alleged that mother abused methamphetamines, which she had taken throughout her pregnancy; she minimized her substance abuse problem; and she lived in a home where illegal drugs were used. On January 20, 2009, the court sustained the detention petition.

On February 3, 2009, the Department requested that A.G. be released to mother, who was now at House on the Hill (HOTH), a residential drug treatment program. The Department noted that A.G. had been released from the hospital and was doing well, and mother was cooperating with the social worker and attending 12-step meetings and had obtained a drug and alcohol assessment. The Department believed that mother understood the need for an intensive, in-patient treatment program to maintain sobriety.

The court granted the request, and A.G. joined mother at HOTH.

### The Jurisdiction and Disposition Hearing

In its jurisdiction report, the Department summarized mother's background. Born in 1972, mother never knew her father. She was raised by relatives until she was 14 and then returned to live with her mother. At 16, she had her first child, D.G., with an 18-

year-old man, who physically abused her. In 1992, she married a drug addict and had a second child, C.C. They split up, and in 1997, mother was convicted of being under the influence of methamphetamine, possession of drugs and paraphernalia, and child endangerment. At that time, D.G. and C.C. were placed in a shelter and with their maternal grandmother. After mother's release from custody, she received social services and agreed to out-patient drug treatment, testing, and parenting classes. However, social workers had difficulty supervising mother's compliance and feared she would relapse because she showed little insight into her drug use.

In 1999, mother had a third child, N.G., during a brief relationship with a 19-year-old man who later committed suicide in his jail cell. In 2000, mother was convicted of possessing and being under the influence of drugs. When it happened again in 2001, the three children went to live with their maternal grandmother, and she became their legal guardian. While mother was in jail, she met a man, and upon release from custody, they got married. Although he was a good man around others and provided for the family, he physically and emotionally abused mother, and she feared him. In 2004, D.G.'s father obtained legal custody of him. C.G. and N.G. remained with their grandmother. In 2005, mother's husband violated parole and was returned to prison. During this time, he and mother separated. In 2006, mother regained custody of C.C. and N.G. Her life had stabilized, and she was clean and sober. Thereafter, mother did well for a while but then brought "unsafe" people into the house and started using drugs again.

The jurisdiction report also stated that a paternity test had excluded mother's husband as A.G.'s father, and upon learning this, he no longer wanted anything to do with A.G. Mother was "devastated" and opined that A.G. had resulted from a "one night stand" with some unidentified man.

The report noted that A.G. was doing well and appeared well cared for with mother at HOTH. Although the Department was concerned about mother's substance abuse, mother had been cooperative with the social worker, had acknowledged her drug

3

problem, and accepted the fact that to stay clean and sober she needed a residential in-patient treatment program. The Department concurred with mother's view and recommended that the court declare A.G. a ward and provide mother and A.G. with family maintenance services.

On February 10, 2009, after a hearing, the court sustained the jurisdiction petition. On March 5, the court conducted a disposition hearing. At that time, the court adopted the Department's recommendations and directed mother to participate in parenting classes and counseling; submit to random drug testing; complete a substance abuse assessment; attend a domestic violence support group; and cooperate with the Family Wellness Court Partners, a specialized dependency drug court.

### The Six- and 12-month Reviews

In its interim review and six-month status report, the Department stated that mother had participated and completed her residential treatment program at HOTH, complied with the other requirements of her maintenance plan, and consistently tested negative for drugs. She had moved to the Castillon Transitional Housing Unit. Mother was in the process of finding employment and housing for her, A.G., and C.C. She was being tested weekly, attending 12-step meetings, starting out-patient treatment with a therapist, and complying with the drug court. Mother and A.G. had been working together with a support person, and except for a persistent cough, A.G. was happy and healthy, eating well, and developmentally on target. After a hearing in September 2009, the court ordered the continuation of family maintenance services.

In its 12-month review, the Department reported that mother continued to engage in her case plan, had maintained positive improvements, participated in out-patient treatment and therapy, and was seeking housing because she had reached the limit at the Castillon. A.G. was over her cough, happy, developing perfectly, and had bonded with mother. After a hearing in February 2010, the court ordered the continuation of services.

4

***Interim Review, Relapse and Increased Drug Testing***

On April 22, 2010, the Department filed an interim report and recommended reducing mother's drug testing to once per month. The Department noted that mother had found a home to rent. She was continuing to work with the social worker and attending employment trainings. She missed one drug test, claiming a packed schedule and transportation issues, and the social worker accepted her explanation, noting that although mother did not call the Department, she did call her attorney about missing the test. The court adopted the recommendation and reduced mother's drug testing.

On April 26, mother failed a drug test and admitted that she had relapsed before her drug testing was reduced. The social worker noted that mother had been avoiding her. For this reason, the Department made an ex parte request on April 29 to reinstate the previous order for weekly drug testing. On May 3, the court granted the request.

On June 15, 2010, the Department filed a request to increase mother's drug testing to twice per week. The Department noted that mother had relapsed in April and again in June and opined that mother needed increased structure to remain clean and sober and that A.G. was at risk if mother continued to relapse. Mother agreed to increased testing, and the court ordered the increase.

***18-Month Review***

In its August 2010, 18-month report, the Department noted that mother, A.G., C.C., and N.G. were living together, and mother was working part-time cleaning houses while A.G. was in daycare. Mother was looking for better employment opportunities. Mother tested positive two more times, but her tests had been clean since June. Mother was participating in therapy and agreed to complete 90 12-step meetings in 90 days. She had consistently followed through with her commitment, although the Department was concerned about suspicious-looking signatures on her 12-step sign-in sheets, missed treatment meetings, and unavailability. A.G., who was 18 months old, was doing well and enjoyed being at daycare very much. The Department recommended against

5

dismissal of A.G.'s dependency and sought an additional six months of family maintenance. The court ordered continued maintenance services and twice weekly drug testing.

### Section 387 Petition

On September 16, 2010, the Department filed a supplemental petition under section 387 seeking A.G.'s removal from mother's custody. The Department explained that mother had relapsed. She admitted regular drug use and requested A.G.'s removal so that she could enter a residential treatment program. On September 17, the court immediately ordered A.G. detained and authorized her placement with her daycare providers who qualified as non-related extended family members (NREFMs).

In its report for the hearing, the Department recommended removal of A.G. and a reunification plan. It noted that mother had admitted repeated relapses with street drugs since May 2010 but could not explain why it happened so often or why she could not reacquire the level of recovery she had attained at HOTH. Mother sought individual treatment apart from A.G. and therefore asked that A.G. be placed with her NREFM caregivers. She also asked that C.C. be considered for placement. The Department placed A.G. with the NREFM caregivers but declined to place C.C. because C.C. had tested positive for marijuana (THC). The Department asserted that mother and C.C. had provided false and misleading information about their drug use and had withheld information that would cause concern for A.G.'s well being.

The Department acknowledged that mother had unwavering and profound love for A.G. It noted that mother understood the need to get clean and sober again in order to regain custody of A.G. Nevertheless, the Department asserted that mother had been able to sustain more than a superficial lifestyle of recovery.

On October 6, 2010, after a hearing, the court sustained the removal petition, placed A.G. with the NREFM caregivers, and ordered reunification services, including visitation with mother at the Mariposa Lodge residential treatment program.

6

*Six-Month Review*

In a February 2011 status report and addendum, the Department recommended that A.G. be returned to mother with family maintenance services. Mother had completed her residential program and was doing well in an outpatient program. C.C. was clean from marijuana. Mother also showed renewed interest in the 12-step program and a commitment to her recovery. Visitation was going well, and mother had some unsupervised visits and an overnight visitation each week. A.G. was healthy and developmentally on track. Because A.G. was throwing tantrums when she did not get what she wanted and sometimes tried to hit N.G., supervised visitation at the NREFM caregiver's home was conducted by a family rehabilitation specialist. The specialist reported that mother and A.G. were becoming more patient with each other, mother provided positive reinforcement and set limits and boundaries, she was learning age-appropriate activities and alternative parenting skills to increase her bond with A.G., and she appeared to be attuned to and able to meet A.G.'s needs. The specialist opined that despite the separation, A.G. had great attachment with mother, and there was a strong parent-child relationship between them.

On February 17, 2011, the court adopted the recommendation and ordered A.G's return to mother with services.

*Family Maintenance Review*

In its August 2011 family maintenance review, the Department reported that A.G. was living with mother and C.C. The Department recommended that the court dismiss jurisdiction because mother continued to diligently care for A.G., appeared to be doing well in therapy, had attended her 12-step meetings, had reworked her relapse prevention plan, had participated in drug court, and had completed outpatient treatment. Moreover, her drugs tests were clean except for one diluted test, which mother explained was caused by her effort to lose weight by drinking lots of water. The Department observed a

7

positive connection between mother and A.G. and that mother had made great strides to overcome her addiction.

However, in an addendum to this review, the Department reported that mother had relapsed again. She had used methamphetamines in July 2011, explaining that she "thought [she] could get away with it." However, mother offered to increase drug testing and 12-step meetings and had rewritten her relapse prevention plan again. Despite mother's excellent performance on her case plan, the Department feared she did not want to give up using methamphetamine. The Department noted that A.G. was born with methamphetamine in her system and two and one-half years later, she still lived in an environment in which mother's relationship with the drug outweighed her relationship with A.G. The Department warned mother that another relapse would result in A.G.'s removal and proceedings to find her a stable home. Under the circumstances, the Department changed its position and now recommended six more months of family maintenance services.

*Second Section 387 Petition*

On December 8, 2011, the Department took A.G. into protective custody and filed another section 387 petition to remove A.G. from mother's custody because mother had tested positive for methamphetamine on November 9, 2011, her fifth documented relapse. On December 13, the court, after a hearing, detained A.G. and placed her with her NREFM caregivers with supervised visitation.

In an addendum to the petition, the Department recounted the circumstances of A.G.'s birth and mother's numerous relapses over next two years.[2] The Department opined that despite substantial family maintenance and support services and residential

---

[2] The Department noted that mother admitted using drugs from March 18 to March 30, 2010, she missed a drug test in April and shortly thereafter tested positive. She tested positive again on May 27, 2010, and the frequency of testing was increased. Between August and September, she had four abnormal tests and missed one test, and in September she tested positive. She again failed tests twice in July 2011.

in-patient drug treatment, mother continued to have significant and unresolved addiction issues that resulted in her putting her desire for drugs over her need to provide care for A.G. Although between relapses mother presented the profile of a "good mother" and things looked good on the surface, mother was no closer to true recovery than she was when A.G. was born. The Department opines that it was likely that after leaving the dependency support system, mother would return to her regular pattern of drug use.

The Department further noted that during her lengthy period of services, mother twice made 90-day 12-step meeting commitments and twice failed to follow through. She also missed three of six meetings at Central Treatment. The Department reported that once, while shopping with the NREFM caregivers, mother was observed shoplifting and putting items in A.G.'s stroller. The Department further reported that mother had failed to tell her housing caseworker the true facts about A.G.'s removal from her custody. On the other hand, mother admitted that C.C. had been staying with her and regularly using marijuana at home. Under the circumstances, the Department asserted that a return to mother's care would be detrimental to A.G.

On December 28, after a hearing, the court sustained the removal petition, and on March 2, the court terminated services, continued A.G.'s placement, and set the case for a section 366.26 hearing.

*Permanency Planning Proceedings*

In its report for the hearing, the Department recommended adoption as the permanent plan. The Department noted that given her young age, A.G. was highly adoptable. She was developmentally on target and had a sweet, charming, and vivacious personality. The Department asserted that having been with her NREFM caregivers for a third of her life, A.G. had become a "big part of her current family and would like to remain." A.G. also "expressed positive and warm feelings" toward her NREFM

9

caregivers and called them mommy and daddy.[3]  They loved her, treated her as a part of their nuclear and extended family, and wanted to adopt her if mother failed to reunify.[4]  In this regard, the Department noted that the NREFM caregivers had always supported mother's efforts to reunify, had always sought the best for A.G., and were steadfast in their belief that she deserved a permanent and stable home with a "forever" family.

A.G.'s NREFM mother declared that she loved A.G. and wanted to be her protector and supporter for life.  She opined that A.G. "feels that this is her home and she is very comfortable here, especially with the other children to play with."  Having adopted other children, she explained that her job was to protect A.G., provide for her material, educational, and emotional needs, and give her a sense of importance and of being loved.

The Department reported that after A.G.'s removal and an initially difficult period, A.G. had adjusted well.  Mother had lengthy and regular visitation, which A.G. looked forward to.  Mother also attended A.G.'s dance recital and sometimes attended church with A.G. and the NREFM caregivers.  The Department opined that A.G. was too young to understand the legal and logistical implications of the dependency case.  However, when asked where she wanted to live, A.G. said with mother.  A.G. also looked forward to her visitation with mother.

Mother maintained her desire to regain custody of A.G.  Although she had tested negative for six months, and even sought extra sessions at her drug program, the

---

[3]  When mother told A.G. not to do so, A.G. referred to her NREFM mother as "mommy number 2."

[4]  The NREFM mother is from a large, intact family.  She and her husband have been together for 40 years.  They raised five children, two biological and three adopted.  They had operated a day-care center for 10 years.  The mother coordinated the program at the Girl's Ministry Group and taught art to children.  The NREFM father was retired.  He had been an investment banker for 22 years.  In retirement, he was a sports journalist at a Salinas newspaper, wrote a Christian blog, and participated in the day-care center.

Department opined that her behavior was the façade of a well-intentioned mother who thought she had put her shortcomings behind her. However, because mother had presented herself in this way before and yet relapsed when caring for A.G., the Department considered her a manipulative parent, who after a temporary period of adherence to court ordered restrictions on alcohol and drugs, repeatedly relapsed when supervision was relaxed or nearly finished. The last time, mother admitted she did so because she thought she could get away with it. The Department opined that although mother could conceivably gain sobriety and freedom from her addiction, she would need a long-term residential program and have to do much work on the issues underlying her addiction. In the meantime, A.G. was at substantial risk of harm in mother's care, and the prognosis that mother would be able to provide for and safely care for A.G. was extremely compromised and limited.

At the hearing on August 3, 2012, mother testified that she had consistently visited A.G., and they talked every day on the phone. Mother said that A.G. was very happy to see her and sad when visitation ended. A.G. told mother that she loved her and missed her and wanted to know when she could come home. Mother also informed the court that she had started her second year of college and wanted to get a business degree. She asserted that with the help of her sponsor, therapist, family, and friends, she had become a totally different person.

For these reasons, counsel for mother argued that there was a beneficial relationship between mother and A.G., and it would be detrimental to terminate it. Accordingly, counsel urged the court to select legal guardianship rather than adoption because the parental relationship would be preserved.

The Department urged the court to terminate mother's rights and free A.G. for adoption. It argued that the beneficial parental exception to termination of parental rights did not apply because A.G.'s need for stability and permanency outweighed any harm

11

from the loss of her relationship with mother. Counsel for A.G. agreed with the Department recommendation.

After considering the record, the testimony, and the statements by counsel, the court found that A.G. was adoptable. It further found that preserving the relationship between mother and A.G. did not outweigh A.G.'s need for stability and permanency, and any detriment to A.G. from the termination of that relationship was not a compelling reason not to free A.G. for adoption.

## III. DISCUSSION

Mother contends that the court erred finding inapplicable the beneficial parent relationship exception.

### A. The Statutory Framework and Standards of Review

" 'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' [Citation.] 'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.] It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the care-taker to make a full emotional commitment to the child.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53 (*Celine R.*).)

At the section 366.26 stage of a dependency proceeding, adoption is the preferred choice. (*Celine R., supra*, 31 Cal.4th at p. 49; § 366.26, subds. (b) & (c).) Section 366.26, subdivision (c)(1), provides in pertinent part: "If the court determines, based on the assessment provided as ordered under [applicable statutory provisions], and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court *shall* terminate parental rights and order the child placed for adoption." (Italics added.)

There are exceptions to the general rule requiring that the court choose adoption where possible. The exceptions, however, " 'must be considered in view of the

legislative preference for adoption when reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Celine R., supra*, 31 Cal.4th at p. 53.)

In particular, section 366.26, subdivision (c)(1)(B) provides that a court need not terminate parental rights if it "finds a compelling reason for determining that termination would be detrimental to the child due to one or more of [certain specified circumstances]" one of which is that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i) [the beneficial parental relationship exception].)

At a section 366.26 hearing, the parent bears the burden to show that termination would be detrimental to the child under this two-pronged exception. (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164, *In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*); see Evid.Code, §§ 110, 115, 190, 550.)

On appeal after a court has rejected a parent's effort to establish the exception, two different standards of review come into play.

Since the parent must first show the existence of a beneficial parental relationship, which is a factual issue, we uphold a court's express or implied finding that there is no beneficial relationship if supported by substantial evidence. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) More specifically, a challenge to a court's failure to find a beneficial relationship amounts to a contention that the "undisputed facts lead to only one conclusion." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1529.) Thus, unless the undisputed facts established the existence of a beneficial parental relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*Bailey J., supra*, 189 Cal.App.4th at p. 1314.)

13

The second requirement for the exception is that the beneficial parental relationship constitute a "*compelling reason* for determining that termination would be detrimental." (§ 366.26, subd. (c)(1)(B), italics added.) Although grounded in the facts, the court's determination on this issue is a " 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Bailey J., supra*, 189 Cal.App.4th at p. 1315.)

### 1. Existence of a Beneficial Parental Relationship[5]

The court did not make an explicit factual finding concerning whether there was a beneficial parental relationship between mother and A.G. However, the court's ruling implies a finding that there was no beneficial parental relationship. As noted, we uphold that finding if supported by substantial evidence, which effectively means we uphold it unless the undisputed evidence leads only to the conclusion that there was a beneficial parental relationship. (*Bailey J., supra*, 189 Cal.App.4th at p. 1314.)

The undisputed evidence establishes that when A.G. was not in mother's custody, mother maintained regular visitation. However, "[i]nteraction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The [beneficial parental relationship] exception applies only where the court

---

[5] Mother asserts, and the Department concedes, that throughout the dependency period, mother maintained regular visitation with A.G. Thus, the pertinent issues are whether mother established a beneficial relationship and whether ending it would be so detrimental as to constitute a compelling reason not to terminate mother's parental rights.

14

finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) Evidence of "frequent and loving contact" is not sufficient to establish the existence of a beneficial parental relationship. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418.)

"The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.)

The record reveals that although A.G. was taken into protective custody at birth, she was returned to mother within a month and remained in her custody from February 2009 until September 2010. The Department's reports reveal that under mother's care, A.G. grew into a happy and healthy 18-month old child, who was developmentally on target and bonded with mother. Mother, in effect, relinquished custody of A.G. to the NREFM caregivers from September 2010 to February 2011 because mother had relapsed and needed to be in a residential treatment program. During that period, however, mother maintained regular visitation, which went very well and progressed to regular unsupervised visits and even overnight visitation. In its reports covering that period, the Department opined that mother had learned age appropriate activities for A.G. and alternative parenting skills, and she had ardently and diligently cared for A.G., who was happy and healthy and developmentally on track. The rehabilitation specialist opined that there was strong parent-child relationship between mother and A.G. For these reasons, A.G. was returned to mother in February 2011, where she remained until December 2011. Under mother's care during that period, A.G. continued to grow and develop. In December 2011 A.G. was removed due to mother's relapse and returned to the NREFM caregivers. After A.G.'s removal, mother maintained lengthy supervised

15

visitation twice per week and called A.G. and regularly on the phone.  The Department noted that A.G. looked forward to visitation and told a social worker she wanted to live with mother.  At the section 366.26 hearing, mother reported that A.G. called her mommy, missed her, and wanted to be with her.

This undisputed evidence establishes that mother had custody of A.G. for well over two years, during which she provided A.G. with physical care, nourishment, comfort, affection and stimulation, shared experiences, and companionship.  Moreover, it establishes that they had loving and meaningful interactions during the periods of visitation.  Finally, it shows that A.G. bonded with mother, they developed a substantial parental relationship, and A.G. had a significant, positive, emotional attachment to mother.  In short, the undisputed evidence reasonably leads to only one conclusion:  there was a beneficial parental relationship between mother and A.G.

The Department notes that much of the time that mother had custody of A.G., mother was under the "watchful" eyes of the staff at her residential treatment centers.  When mother obtained separate housing, her drug testing decreased, and without that structure, mother relapsed.  As a result, drug testing was increased.  Despite mother's promises to do everything necessary to maintain her sobriety, she started missing 12-step meetings, outpatient sessions, and drug tests.

The Department argues that "[t]wo residential drug programs, two outpatient programs, therapy, drug court, testing, housing, and childcare" were not enough to help mother overcome her addiction.  According to the Department, the "rosy picture" of A.G. while in her care that mother painted was just a façade because "[mother's] need for drugs repeatedly jeopardized A.G.'s health and well-being."  Moreover, the Department points out that at one point, C.C. was living with mother and A.G. and was smoking marijuana; and on one occasion, mother used A.G.'s stroller to hide stolen goods.

The Department's reports and the undisputed evidence of mother's participation in drug treatment programs and drug testing reveal that for the vast majority of A.G.'s life,

16

mother was committed to sobriety and made a concerted effort to maintain it. However, the undisputed evidence also reveals that despite the momentum of periods of sobriety and substantial support services, mother used methamphetamines on several occasions. These instances of relapse demonstrate the depth of mother's addiction and how her will power and commitment to sobriety waned outside a structured drug treatment program and testing regime. Moreover, these relapses together with apparently allowing C.C. to smoke marijuana in the house and using a stroller to steal also reflect instances of poor judgment that implicate mother's ability to properly care for A.G.

However, the evidence cited by the Department does not erase the undisputed fact that during her lengthy time under mother's care, A.G. grew into a healthy, happy, thriving, developmentally on target little girl, who had bonded with mother and now loved, missed, and wanted to live with her. In other words, the evidence cited by the Department does not constitute substantial evidence to support the court's implied finding that A.G. did not develop a significant and meaningful emotional bond and parental attachment to mother. (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

### 2. Discretionary Balancing of Interests

In addition to establishing a beneficial parental relationship, mother also had to convince the court that the relationship constituted a "compelling" reason not to terminate her parental rights. (§ 366.26, subd. (c)(1)(B); *Celine R., supra*, 31 Cal.4th at p. 49.) This prong has been interpreted to mean those situations where "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not

17

terminated." (*Autumn H., supra,* 27 Cal.App.4th at p. 575; accord, *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

As noted, the juvenile court concluded that the potential detriment to A.G. from the loss of her relationship with mother did not constitute a compelling reason not to terminate mother's parental rights, and we review this conclusion for abuse of discretion. (*Bailey J., supra*, 189 Cal.App.4th at p. 1315.)

" 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 364, p. 420; see *Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355.) 'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion. [Citation.] . . . [¶] The legal principles that govern the subject of discretionary action vary greatly with context. [Citation.] They are derived from the common law or statutes under which discretion is conferred.' (*City of Sacramento v. Drew* (1989) 207 Cal. App. 3d 1287, 1297-1298.) To determine if a court abused its discretion, we must thus consider 'the legal principles and policies that should have guided the court's actions.' (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773).) Accordingly, we determine whether we have sufficient confidence in what the trial court did to defer our consideration to its decision.

The record reflects that before ruling, the court reviewed the legal principles that governed its determination at permanency planning hearing under section 366.26. The court's analysis further reveals that it understood the balancing of interests involved in

18

deciding whether to apply the beneficial parental relationship exception notwithstanding undisputed evidence that A.G. was adoptable.

Given the record, we cannot conclude—and defendant fails to convince us—that the court abused its discretion in finding that the strength and quality of A.G.'s relationship to mother in a tenuous placement was outweighed by the sense of stability, permanency, and belonging that the NREFM family would confer; and that the harm to A.G. from severing her relationship with mother was not so great as to represent a compelling reason to disregard the statutory preference for adoption.

First, there was no testimony from a mental health provider, social worker, or bonding expert that the termination of parental rights so that A.G. could be adopted would cause serious and perhaps lasting emotional or psychological scars or detriment to A.G.

Although the rehabilitation specialist opined that A.G. had a significant and meaningful emotional attachment to mother, his comments predated A.G.'s last removal, mother's last relapse, and C.C.'s reported drug use in the house. The record also shows that at the time of the hearing, A.G. was only three and a half years old. Twice during her short life, mother disrupted A.G.'s attachment and the continuity of their relationship by succumbing to her addiction. Mother's last relapse, despite an unequivocal warning that it would result in A.G.'s removal, emphasized that mother had significant and unresolved issues with addiction and demonstrated that mother was no closer to dealing successfully with her addition and the underlying issues than she was when A.G. was born. This is especially so because according to mother, she used methamphetamine the last time because she thought she could get away with it. Accordingly, the court reasonably could have concluded that for the foreseeable future, mother's history of chronic substance abuse, unresolved addiction issues, and the lure of methamphetamines posed a significant, ongoing, and destabilizing risk to whatever benefits A.G. derived from her attachment to mother. Indeed, notwithstanding the positive showing that mother

19

made at the hearing and her expressions of commitment, mother's current sobriety was of relatively short duration. Given mother's track record of failure after much longer periods of sobriety, the court reasonable could have found a substantial likelihood that mother's pattern of apparent success and then relapse would inevitably repeat itself.

On the other hand, the record reveals that during the year A.G. spent with her NREFM caregivers, she developed significant and meaningful emotional attachments to them and called them mommy and daddy. They had known A.G. since she was about 18 months old and had provided a safe, stable, and consistent home as well as a sense of familial membership in which A.G. also thrived and continued to develop into a happy and healthy young girl. Moreover, the caregivers demonstrated their commitment to A.G. by wanting to adopt her and give her a permanent and dependable family and home.

Mother notes that the family rehabilitation specialist supervised visitation because at that time in A.G.'s life, she was throwing tantrums and displaying aggressive behavior. According to the specialist, mother helped A.G. address and overcome those behavioral issues. Mother argues that her success demonstrates that her interactions with A.G. concerning A.G.'s special needs were particularly positive. Mother also notes that A.G. expressed her desire to live with mother and showed sadness because she missed her. For these reasons, mother argues that the harm from a permanent separation provided a compelling reason not to terminate parental rights and to select a guardianship instead of adoption. We are not persuaded.

Although the Department arranged for a rehabilitation specialist to supervise visitation in the NREFM home when A.G. was around 18 months old because of tantrums and aggressive behavior, such behavior by a toddler is not strange or out of the ordinary. More importantly, although mother showed good skills during the supervised visits in dealing with A.G.'s problematic behavior, there is no evidence that mother was so particularly attuned to A.G. and her approach so perfectly tailored and uniquely suited to A.G.'s behavioral issues that the loss of mother's parenting skills could be considered

20

a significant detriment to A.G.'s well being. Indeed, subsequent reports by the Department did not reveal that A.G.'s behavioral issues persisted after A.G. was returned to mother for the second time or reappeared when she was later removed and went to the NREFM home. Accordingly, mother's apparent success in dealing with A.G.'s tantrums and aggressive behavior does not necessarily constitute a compelling reason not to terminate her parental rights.

Mother's reliance on *In re Brandon C.* (1999) 71 Cal.App.4th 1530 (*Brandon C.*) and *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) is misplaced.

In *Brandon C.*, two minors were declared dependent children because they had been victims of domestic violence, and their mother had a history of substance abuse. They were placed with their paternal grandmother. Reunification services were terminated when the parents failed to complete court-ordered treatment. At the permanency planning hearing, the juvenile court ordered legal guardianship for the minors with their paternal grandmother without terminating parental rights, finding that it would be in the children's best interests to preserve the ongoing relationship with their mother who had maintained regular visitation. (*Brandon C., supra,* 71 Cal.App.4th at pp. 1532-1533.)

The Department of Child and Family Services appealed claiming there was insufficient evidence that termination of parental rights would be detrimental. (*Brandon C., supra,* 71 Cal.App.4th at p. 1533.) In rejecting this claim, the court noted that over the four years of the dependency from 1994 to 1998, mother had consistently maintained regular visitation, during which she interacted with and played with the children, helped feed and care for them, and kept them safe. At one point during this period, one of the children cried for long periods and resisted going to bed after mother's visits. Both children had a good relationship with and seemed to love mother, whom they called mommy, and they looked forward to her visits. In addition, mother had completed her drug rehabilitation program, she had maintained a stable residence, and she had been

21

employed as a receptionist in a law office. The children's grandmother opined that it was not in the children's best interests to terminate mother's rights because of their relationship to her. However, she preferred to adopt her grandchildren rather than be their guardian. Either way, she felt that mother would always be in their lives, and they would always refer to her as mommy. Mother testified that she and the children were closely bonded. The court found that this evidence was sufficient to support the juvenile court's finding that termination of mother's rights would be detrimental to the children. (*Id*. at pp. 1535-1537.)

*Brandon C.* is distinguishable. There the issue was whether substantial evidence supported the court's finding that termination would be detrimental. The issue here is whether the court abused its discretion in concluding that termination would not be so harmful to A.G. that preserving mother's rights outweighed the benefit to A.G. of a stable and permanent family and home. Each dependency case has its own set of unique facts, and *Brandon C.* does not establish that termination here would cause great harm to A.G and thus constitute a compelling reason not to terminate mother's rights. Nor does *Brandon C.* convince us that the court abused its discretion in concluding otherwise.

Mother asserts that this case is more similar to *S.B., supra*, 164 Cal.App.4th 289. However, S.B. is also factually distinguishable. There, the father established the existence of a significant, positive, emotional attachment between him and his daughter based on undisputed evidence that he had been her primary caretaker for three years before she was removed from his custody due to his drug use. At that time, he immediately acknowledged that his drug use was untenable, started services, maintained his sobriety, sought medical and psychoanalytic services, and complied with every aspect of his case plan. Moreover, after a year apart the child continued to display a strong attachment to her father. (*Id*. at p. 298.) In addition, there was a bonding study by a psychologist who described the bond between father and the child as fairly strong and opined that there was potential for harm if the child lost her parental bond with the father.

22

Based on this record, the court concluded that "the only reasonable inference is that [the child] would be greatly harmed by the loss of her significant, positive relationship with [her father]." (*Id.* at pp. 300-301.)

Here, mother has not shown the same devotion to A.G. and her case plan as that shown by the father in *S.B.* Rather, despite substantial services, mother failed drug treatment and had numerous relapses that twice required A.G.'s removal, interrupted the continuity of her relationship to A.G., demonstrated that her drug addiction was far more deeply rooted and difficult than she acknowledged, and showed that mother was unable to maintain sobriety without the close support and scrutiny of an intensive drug treatment program. Moreover, there was no bonding study by a psychologist or testimony that A.G. could potentially be harmed if A.G. was freed for adoption.

### 3. Conclusion

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; accord *In re K.P.* (2012) 203 Cal.App.4th 614, 621.) This is not such an extraordinary case. Although the record reveals that mother had a beneficial parental relationship to A.G. and A.G. had a meaningful attachment, the record does not lead to only one conclusion that the loss of that relationship and attachment represents a compelling reason to overcome the legislative preference for adoption. Nor does mother convince us that the court abused its discretion in not reaching that conclusion.

### IV. DISPOSITION

The order terminating mother's parental rights is affirmed.

23

_____
RUSHING, P.J.

WE CONCUR:

_____
PREMO, J.

_____
ELIA, J.

24