Filed 6/26/13  P. v. Herrera CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038416 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC958100) |
| v. | |
| RUBEN FRANK HERRERA, | |
| Defendant and Appellant. | |

Defendant Ruben Frank Herrera and his wife, Desiree Herrera,[1] pleaded no contest to one count of grand theft (Pen. Code, §§ 484-487, subd. (a)),[2] three counts of willfully making a false tax return (Rev. & Tax. Code, § 19705, subd. (a)(1)), and ten counts of money laundering (§ 186.10, subd. (a)) after Desiree embezzled over $1.4 million from her employer, County Building Materials, Inc. (CBMI).  Desiree was sentenced to 10 years in prison; defendant was granted probation for five years, subject to several conditions, including that he serve one year in jail.  In accordance with the parties' plea agreement, the court found defendant and Desiree jointly and severally liable for over $1.6 million in victim restitution to CBMI and the Franchise Tax Board (FTB).  As

---

[1] For ease of reference and meaning no disrespect, we shall hereafter refer to Mrs. Herrera as "Desiree" and Mr. Herrera as "defendant."

[2] All further statutory references are to the Penal Code unless otherwise specified.

conditions of probation, the court ordered defendant: (1) to report to his probation officer within three days of his release from custody, (2) to file amended tax returns for 2006 through 2008 with the FTB within 90 days of his release from custody, and (3) to report to the Department of Revenue (DOR) for a determination of his ability to pay fines and fees. The court advised defendant that if he disagreed with DOR's finding, he was entitled to a hearing on that issue. The DOR subsequently determined that defendant had the ability to pay a minimum of $300 per month in victim restitution; defendant did not contest that finding.

Almost two years after defendant was released from custody, the probation department petitioned the court to revoke his probation (1203.2, subd. (b)), alleging two violations: (1) that although defendant had the ability to pay, he willfully failed to make monthly payments towards victim restitution; and (2) that he had failed to show proof that he had complied with the court's order to file amended tax returns. After a hearing, the court found that defendant had violated both conditions, revoked probation, and sentenced him to four years four months in prison.

On appeal, defendant challenges the sufficiency of the evidence to support the trial court's finding that he "had the ability to pay victim restitution on a monthly basis and did not do so." He also argues that even if he violated both conditions, the court abused its discretion when it sentenced him to prison. He asserts that since one of the probation violations cannot stand, the matter must be remanded to the trial court to exercise its sentencing discretion based on the remaining violation.

We conclude that substantial evidence supports the trial court's findings that defendant had the ability to pay and willfully failed to make monthly payments toward victim restitution; therefore, the court did not abuse its discretion when it revoked probation and sentenced defendant to prison. Accordingly, we will affirm the judgment.

2

## FACTS & PROCEDURAL HISTORY

### *Original Offenses:  Embezzlement, Tax Evasion, Money Laundering*

In July 2009, CBMI contacted the San José Police and reported that Desiree, an accounts receivables clerk, had embezzled $1,429,600 from the company between 2002 and 2009.  In August 2009, officers searched defendant's home pursuant to a warrant.  During the search, defendant and Desiree "gave incriminating statements" that "implicated them in embezzlement, money laundering and tax evasion."  Agents from the FTB assisted in the investigation.

In October 2009, the prosecution charged defendant and Desiree by complaint with one count of grand theft (§§ 484-487, subd. (a)); three counts of willfully making a false tax return (Rev. & Tax. Code, § 19705, subd. (a)(1)) for 2006, 2007, and 2008; and ten counts of money laundering (§ 186.10, subd. (a)) on various dates in 2008.  Defendant was arrested on October 20, 2009, and taken into custody.

### *Plea Agreement and Sentencing*

In February 2010, defendant, Desiree, and the prosecution entered into a plea agreement pursuant to which both defendants pleaded "no contest" to all of the charges.  In March 2010, pursuant to that agreement, the court sentenced Desiree to 10 years in prison.  As for defendant, the court suspended imposition of sentence and placed him on formal probation for five years, on the condition that he serve one year in jail.  In accordance with the plea agreement, the court found defendant and Desiree jointly and severally liable for victim restitution as follows:  (1) $1,429,000 to CBMI; (2) $182,635 to FTB for back taxes owed, and (2) $3,165 to FTB for investigation costs.  As conditions of probation, the court also ordered defendant to file amended tax returns with the FTB for 2006 through 2008 within 90 days of his release from custody, to report to his probation officer within three days of his release from custody, and to report to the

Department of Revenue (DOR) for a determination of his ability to pay fines and fees. The court advised defendant that if he disagreed with DOR's finding, he was entitled to a hearing on his ability to pay fines and fees. The DOR subsequently determined that defendant had the ability to pay a minimum of $300 per month in victim restitution; defendant did not contest that finding.

*Probation Violations*

On February 23, 2012, defendant was arrested and taken into custody on allegations that he had violated the conditions of his probation. He was arraigned that same day and his probation was summarily revoked (former § 1203.2, subd. (a)). In the petition to revoke probation, the probation officer alleged two circumstances of violation: (1) that defendant had "willfully failed to make monthly payments, to the best of his ability, towards victim restitution" and (2) that he had "failed to show proof of filing amended tax returns for years 2006 [through] 2008 within 90 days of release."

The court conducted an evidentiary hearing on the alleged probation violations on May 7, 2012. At the conclusion of the hearing, the court found that defendant had violated the probation conditions at issue, revoked defendant's probation, and sentenced defendant to four years four months in prison,[3] to be served in the county jail pursuant to section 1170, subdivision (h). Regarding the alleged failure to pay victim restitution, the court found that defendant "had the ability to pay victim restitution on a monthly basis and did not do so." The following is a summary of the evidence presented at the evidentiary hearing.

---

[3] The court imposed the aggravated term of three years on the grand theft count, eight months (one-third the middle term) consecutive on one of the tax evasion counts, and eight months (one-third the middle term) consecutive on one of the money laundering counts. On all of the other counts, the court imposed the aggravated term of three years to run concurrently with the principle term.

**Prosecution Case**

The prosecution's evidence consisted of the testimony of defendant's probation officer, Frank Nesci, as well as probation department records and file notes documenting the observations of each of the probation officers that had supervised defendant, and DOR records. Our summary is based on both Probation Officer Nesci's testimony and the documentary evidence.

Defendant was released from custody on April 20, 2010. On April 22, 2010, defendant met with Probation Officer Mai Nguyen. Defendant told Nguyen he used the money his wife embezzled for living expenses and to pay one of his employees. Later, he denied using the money to pay an employee. On April 22, defendant signed the probation department's Standard Terms and Conditions form, which included the following advisement: "If the Court has ordered you to pay fine[s], restitution, or other [*sic*], payment must be made as promptly as possible and as directed by the Department of Revenue [(DOR)]. . . . Report immediately to set a payment schedule." Defendant also signed a copy of the court's minute order, which set forth the conditions of his probation. He acknowledged the specific amounts he had been ordered to pay as restitution. Defendant said he was living with his in-laws and two daughters (ages 17 and 19) and planned to restart his contracting business. Defendant reported that he had prior convictions for felony drug possession, driving without a license, and driving under the influence.[4] Defendant told Nguyen he had given financial information to DOR. According to DOR documents in evidence, defendant was on a payment plan and was expected to pay $300 per month. This was the anticipated minimum payment per month set by DOR after speaking with defendant.

---

[4] Defendant had a restitution order for one of the prior convictions and was making regular payments of $55 per month to the DOR in 1997 and 1998. He still owed $7,996.50 on that account in September 2010.

After the first meeting, defendant's case was transferred to Probation Officer Tania Ruiz on the high risk restitution caseload. Defendant met with Ruiz on June 24, 2010. Defendant told her "he works rarely due to slow work" in construction; he said he had a construction business, but his business license expired when he was in custody. Defendant reported that he owned two homes in San José, that renters were covering the mortgages, and that he "pocketed" $1,200 of the $5,100 rent collected each month. Defendant said he owned "a brand new 2010 Black Chevy Camaro ($44,000) and a 2008 Black Cadillac Escalade ($90,000)." Ruiz made a note to advise defendant, at their next appointment, that he needed to sell assets to pay victim restitution. Defendant made restitution payments of $100 per month for June, July, August, and September 2010. (This assumes the June 17, 2010 payment was for July.)

Defendant met with Ruiz again on September 23, 2010, and reported that he was making payments of $100 per month toward victim restitution. He told Ruiz that he was losing his second home in a short sale. Ruiz told him he still owed $1,614,400 in victim restitution and advised him to start making larger payments or he "would be taken back to court."

When Ruiz visited defendant at his home on October 19, 2010, she observed two black Camaros and a "work truck" parked in his driveway; defendant admitted the 2010 Camaro was his. Defendant told Ruiz he had stopped paying the mortgage; she told him he should not be at home and should be actively seeking employment instead. Two days later, defendant paid $200 in victim restitution. But he did not make any restitution payments in November or December 2010.

On January 5, 2011, defendant met with Ruiz and told her he had obtained a job with Bell Electric, but that his start date had to be postponed four weeks because he broke his foot. Two days before that meeting, defendant paid $200 toward victim restitution.

Ruiz also visited defendant in his home on February 23, 2011, and smelled marijuana when she entered the house. Defendant said it belonged to his daughter's

6

boyfriend; defendant tested negative for drug use. Ruiz reminded defendant that he needed to find work to pay victim restitution. Defendant said no one will hire him, but he does side jobs. He said his payments on the Camaro were $400 per month, but that his daughter paid half of that. Ruiz suggested he sell the Camaro, buy a less expensive car, and use the extra money to pay victim restitution. In February 2011, defendant paid $200 in victim restitution.

In March 2011, defendant told Ruiz that he had "landed a 3-month contracting job (entire home renovation)" starting the following week. Defendant expected to make $28,000 and planned to use most of the money to pay victim restitution. He also reported that he was going to start a kitchen and bath remodeling job in August. In March 2011, defendant paid $100 in victim restitution.

When defendant reported to Ruiz in June 2011, she reprimanded him because he had not made any payments in three months. Defendant said he would "catch up" with a $1,000 payment that week and pay $350 for the month of June the following Friday. Ruiz told him he could afford to pay more. Defendant said he had to pay a $500 deductible after his daughter was in a car accident, stated he had to pay $8,500 in legal fees to remove a lien on his home, and said he gave his cousin several thousand dollars for a funeral. Ruiz reprimanded him for making other things a priority over victim restitution and told him that if he did not get back on track, he would be facing a probation violation.

Six weeks later, defendant still had not made any payments toward victim restitution. When Ruiz called him on July 21, 2011, defendant said he had paid $300 that day and would pay another $300 to $400 the following day. According to DOR records, defendant paid $300 on July 21 and another $300 on July 22, 2011.

In August 2011, defendant told Ruiz he was working in construction and was able to pay $100 per week; he said he knew he was expected to pay at least $400 per month. Defendant said he was filing for bankruptcy because of back taxes owed. Defendant

made restitution payments of $200 in August, nothing in September, and $800 in October 2011.

In November 2011, defendant reported that one of his houses had been sold; it appears he was working. He paid $200 in restitution that month.

Defendant paid $100 in restitution on December 22, 2011, but failed to report to probation that day because he was working in San Francisco. About this time, his case was transferred to Probation Officer Frank Nesci.

On December 28, 2011, defendant met with Nesci and said he was self-employed as a "contractor (carpenter)." He said he was "working under the table," was paid in cash, and was not reporting his earnings. Defendant said he was not working for a "regular company" because he did not want his wages garnished since that would not leave him with enough to live on. Nesci told him he was breaking the law by working under the table, said he needed to find regular employment, and referred him to several employment agencies. Defendant said he had lost two homes and was close to having his Camaro repossessed. Nesci told defendant to bring pay check stubs, bank statements, household bills, car bills, and his tax returns for 2009 and 2010 with him to the next appointment so the probation officer could get a better understanding of defendant's finances.

Defendant did not make any restitution payments in January or February 2012. He met with Nesci on February 6, 2012, but failed to bring any of the requested documents with him. Defendant said he did not have a bank account, a credit card, or copies of his bills. He told Nesci he was making car payments of $400 per month, had $600 per month in recurring expenses, and made $2,500 per month when he was working under the table. He reported that he was working for SPC Contractors (SPC) as a "carpenter/foreman" making $30 per hour and that he was working nine hours a day, six day a week. According to Nesci, that is $7,020 per month. Nesci searched defendant and found a California identification card, an iPhone, and the key to the Camaro; he searched the

8

Camaro and found a second cell phone, car loan bills, and letters from a bank about his home loan. The car loan statements confirmed that defendant's payments on the Camaro were $400 per month and indicated that he owed between $14,000 and $14,700 on the loan. Nesci researched defendant's cars on Kelly Blue Book and determined that the 2010 Camaro was worth $28,000 and the 2008 Escalade was worth $35,000. Defendant also owned a 2005 Mercedes C230 and a "work truck"; his daughter drove the Mercedes.

According to the DOR records, defendant paid $3,000 in victim restitution during the 22 months that he was out of custody,[5] an average of $136.36 per month. During that time, there were nine months that he did not make any payments; several times, he had to be reminded to pay.

**Defense Case**

Defendant's family friend of 15 years, Elias De los Santos, testified that after defendant was incarcerated on the probation violations, defendant asked for his help selling the Camaro and the Escalade. De los Santos went to two dealerships and was not able to sell either car. The Camaro was later repossessed from De los Santos's house; he did not know what happened to the Escalade. De los Santos did not know where defendant was working or living between 2010 and 2012.

Defendant testified that after sentencing in March 2010, he received a bill from the DOR requiring him to pay $32,000 per month in victim restitution. After discussing his case with the DOR, "they told [him to pay] $100 a month." Some months, he paid $100; other months he paid more because he was late or the probation officer asked him to pay more. When he was not working, he paid nothing. Defendant testified that each month, he paid to the best of his ability.

_____

[5] Defendant was released from jail on April 20, 2010 and taken back into custody on the probation violation on February 23, 2012. Although counsel refer to this period as "23 months," by our count, it is closer to 22 months.

9

Defendant told the court he started working for SPC around February 6, 2012; before that, he did casual labor and made enough "to get by to pay [his] restitution." Tax records defendant placed in evidence revealed that he had worked for SPC before, in 2008. Defendant testified that with his skills, he could earn $20 to $35 per hour. He said he was in business for himself for three years. And he testified that the contracting jobs he told Probation Officer Ruiz about in March 2011 both fell through.

Defendant's expenses included utilities, a cell phone, and payments on the Camaro.[6] He said that he purchased the 2010 Camaro in May 2009 for $33,000 or $38,000; he put $10,000 down and got credit for a trade-in. He stopped making payments on the Camaro in the Fall of 2011; he was five months behind when incarcerated for the probation violation. He acknowledged that he had owned a 2005 Mercedes C230, which he said was repossessed while he was in jail in 2009, and a "work truck," which he stated was repossessed in January 2010. He bought the 2008 Escalade in 2007 for $95,000; his cousin took over the payments in May 2009. The Escalade was involved in a major accident in 2008 and cost $47,000 to repair; those costs were paid by insurance.

At the end of the hearing, the judge stated that he thought De los Santos was evasive, but his testimony was not crucial, and that he did not find much of defendant's testimony credible.

## DISCUSSION

### General Principles Regarding Probation Revocation

Under former section 1203.2, subdivision (a), which was in effect during the probation revocation hearing in this case, a court was authorized to revoke probation "if

---

[6] Defendant's amended tax records suggest that some of the embezzled funds were used for gambling. In 2008, he declared gambling winnings and losses of $47,600.

10

the interests of justice so require and the court, in its judgment, has reason to believe . . . that the person has violated any of the conditions of his or her probation, has become abandoned to improper associates or a vicious life, or has subsequently committed other offenses, . . . ." " 'When the evidence shows that a defendant has not complied with the terms of probation, the order of probation may be revoked at any time during the probationary period.' " (*People v. Johnson* (1993) 20 Cal.App.4th 106, 110.) The violation must be proven by a preponderance of the evidence. (*People v. Rodriguez* (1990) 51 Cal.3d 437, 441, 447 (*Rodriguez*).) The constitutionality of this standard of proof "derives from the fact that '[r]evocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special [] restrictions.' " (*Id.* at p. 442, quoting *Morrissey v. Brewer* (1972) 408 U.S. 471, 480.)

### Standard of Review

In reviewing an order revoking probation, we give great deference to the trial court's decision, bearing in mind that "[p]robation is not a matter of right but an act of clemency, the granting and revocation of which are entirely within the sound discretion of the trial court." (*People v. Pinon* (1973) 35 Cal.App.3d 120, 123.) "It has long been recognized that the Legislature . . . intended to give trial courts very broad discretion in determining whether a probationer has violated probation." (*Rodriguez*, *supra*, 51 Cal.3d at p. 443, citing *People v. Lippner* (1933) 219 Cal. 395, 400 [". . . only in a very extreme case should an appellate court interfere with the discretion of the trial court in the matter of denying or revoking probation . . ."].) "Such discretion 'implies that in the absence of positive law or fixed rule the judge is to decide a question by his [or her] view of expediency or of the demand of equity and justice.' [Citation.]" (*Rodriguez,* at p. 445.)

11

But trial court discretion is not unlimited. " ' "The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]" ' " (*People v. Jacobs* (2007) 156 Cal.App.4th 728, 737 (*Jacobs*), quoting *Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355.) Abuse of discretion has both a factual component and a legal component. (*Jacobs*, *supra*, at p. 737.) While the court's discretion is very broad, its determination must be based on the facts before it. (*People v. Zaring* (1992) 8 Cal.App.4th 362, 378.) Defendant challenges the factual component of the trial court's decision and argues that the trial court abused its discretion because there was insufficient evidence to support the court's finding that defendant "had the ability to pay victim restitution on a monthly basis and did not do so."

### *Substantial Evidence Supports the Court's Finding that Defendant Violated the Probation Condition that Required Him to Pay Victim Restitution*

When the court grants probation and orders the defendant to pay restitution, the court shall make the payment of restitution a condition of probation. (§ 1202.4, subd. (m).) All payments, monies, and property collected from any person who has been ordered to make restitution must be first applied to pay the amounts ordered as victim restitution. (Cal. Const., art. I, § 28, subd. (b)(13)(C).)

Although ability to pay is not a factor the court may consider when determining the amount of a restitution order (§ 1202.4, subd. (g)), ability to pay is a factor the court is authorized to consider when deciding whether probation should be revoked for failure to pay victim restitution (former § 1203.2, subd. (a)). Under former section 1203.2, subdivision (a), probation may not be revoked for failure to make restitution as a condition of probation "unless the court determines that the defendant has willfully failed to pay and has the ability to pay." This provision "was intended to prevent imprisonment

12

of probationers who have simply been unable to fully pay restitution." (*People v. Medeiros* (1994) 25 Cal.App.4th 1260, 1267.)

Defendant argues that the prosecution did not prove that he violated the probation condition that required him to pay victim restitution. Defendant focuses on the evidence most favorable to his case and attempts to reargue the evidence before this court. As we shall explain, substantial evidence supports the trial court's findings that defendant "had the ability to pay victim restitution on a monthly basis and did not do so."

In any court where a county financial evaluation officer is available, the court may order the defendant to appear before that officer, who will evaluate the defendant's ability to pay restitution and report his or her findings to the probation officer. (§ 1203, subd. (j).) Any order made pursuant to section 1203, subdivision (j) "may be enforced as a violation of the terms and conditions of probation upon willful failure to pay and at the discretion of the court." (§ 1203, subd. (j).)

In this case, the court ordered defendant to report to the DOR. There was evidence that defendant complied and reported to the DOR shortly after his release from custody in April 2010; that DOR conducted an evaluation and concluded that defendant could pay *a minimum of* $300 per month in victim restitution; and that DOR reported that finding to the probation department. There was also evidence that during the 22 months that defendant was out of custody on probation, he paid only $3,000 in victim restitution, an average of $136.36 per month. Most of the time, he paid either $100 or $200 per month. There were only two occasions that he paid more than $200: in July 2011, he paid $600, after not having made any payments for three months; in October 2011, he paid $800, after skipping the September 2011 payment. During the 22 months that defendant was on probation, there were nine months that defendant did not make any payments. This evidence alone was sufficient to support the trial court's finding that defendant had the ability to pay victim restitution on a monthly basis and failed to do so.

13

*People v. Jackson* (2005) 134 Cal.App.4th 929 (*Jackson*) supports our conclusion. The defendant in *Jackson*, was ordered to pay $15,862 in victim restitution at a minimum payment of $50 per month. (*Id.* at p. 935.) The defendant made only 43 payments during the last 57 months that she was on probation. The appellate court held that substantial evidence supported the trial court's finding of a violation of probation where the defendant "neither paid the full amount of the restitution order nor made the minimum required monthly payment each month she spent on probation." (*Ibid*.) Like the defendant in *Jackson*, defendant failed to make payments every month while he was on probation. In addition, he rarely paid the minimum amount established by the DOR.

There was also evidence that at the start of his probation in April 2010, defendant owned two homes and four vehicles; two of the vehicles were relatively new and expensive when purchased. In February 2011, the probation officer suggested defendant sell his 2010 Camaro, buy a less expensive car, and use the proceeds of the sale to pay victim restitution. There was evidence that a year later, in February 2012, the Camaro was worth $28,000 and the outstanding debt on the car was between $14,000 and $14,700, which supports the conclusion that defendant could have sold the car and applied the approximately $13,000 in equity toward victim restitution. A reasonable inference from these facts is that defendant would have had even more equity in the car if he had sold it in 2010 or 2011. Defendant also owned a "work truck" that he could have used for transportation in place of the Camaro. In addition, after selling the Camaro, defendant could have applied the $400 per month that he was making in car payments towards victim restitution. Defendant made no effort to use this valuable asset to pay victim restitution. Instead, he stopped making his car payments, which set the stage for the asset to be repossessed by the lender. And after he stopped making his car payments in the fall of 2011, he did not use the money he would otherwise have spent on the car to pay victim restitution.

There was ample evidence that defendant had the ability to work. Defendant testified that with his skills, he could command $20 to $35 per hour. He reported obtaining remodeling jobs through his contracting business, as well as regular employment with Bell Electric and SPC. His hourly wage at SPC was $30 per hour. He worked there for about three weeks, but did not make any restitution payments during that time. He told his probation officer he made unreported income of $2,500 per month while "working under the table" and only had expenses of $1,000 per month. And in August 2011, he told Ruiz he was able to pay $100 per week, which is $400 per month. Thus, the evidence supports the conclusion that defendant could have paid more in victim restitution than the $136.36 per month he paid on average. Finally, there was evidence that defendant was not making victim restitution a priority. In June 2011, after failing to pay restitution for three months, he reported that he had given his cousin several thousands of dollars for a funeral.

For these reasons, we conclude that substantial evidence supports the trial court's factual finding that defendant violated the condition of his probation that required him to pay victim restitution. Since there was substantial evidence to support the trial court's finding, the court did not abuse its discretion when it revoked probation in this case and imposed a prison sentence.

### Abuse of Discretion

As defendant notes, upon revocation of probation, the trial court had three sentencing options, namely: (1) to reinstate probation on the same terms and conditions; (2) to reinstate probation on modified terms and conditions; or (3) to terminate probation and commit the defendant to state prison. (*People v. Medina* (2001) 89 Cal.App.4th 318, 321-322.)

Defendant contends that even if he violated both conditions of probation, it was an abuse of discretion to sentence him to prison. He argues that this was his first probation

15

violation, that there was "no clarity whatsoever as to the amounts [defendant] could have paid in restitution," and that his claim that he found a job that paid $30 per hour "set the present proceedings in motion."

Defendant's contentions are not supported by the record. Defendant had undergone an evaluation by the DOR, which had concluded that he could pay a minimum of $300 per month toward victim restitution. The prosecution placed DOR documents in evidence, which showed that defendant was on a payment plan that required him to pay a minimum of $300 per month. In addition, the court said it did not find defendant's testimony credible. This includes defendant's testimony that the DOR had determined that he had the ability to pay only $100 per month in victim restitution.

Defendant's assertion that finding a job with SPC that paid $30 per hour prompted the petition to revoke probation makes no sense. Defendant had been on probation for 22 months when he was arrested on the probation violations. During that time, he was admonished repeatedly by his probation officers that he needed to pay more in victim restitution and to make timely payments or risk facing a probation violation. His payment record did not improve during that time and arguably got worse. The record supports the conclusion that defendant was being evasive regarding his employment. He was working under the table to avoid wage garnishments and having to report his income. When Probation Officer Nesci asked him to produce check stubs and tax records, he failed to comply. Although the trial court had the discretion to reinstate probation, either on the original terms or modified terms, we cannot say, under the circumstances of this case, that the court abused its discretion when it revoked probation and sentenced defendant to prison.

### *Remand Is Not Required*

Defendant argues that "because one of the two violations found by the court cannot stand, the matter must be remanded to the trial court so that it can exercise its

discretion based solely on the remaining violation."  Since substantial evidence supports the court's finding that defendant willfully failed to make monthly victim restitution payments and defendant does not challenge the court's finding on the second probation violation, we shall not reach this contention.

Finally, Defendant contends that "if this Court remands for reinstatement of probation," we should direct "the trial court to clarify the condition requiring amendment of the state income tax returns" and specify whether the amended return is to be a joint return for both defendant and Desiree, and "if jointly . . . , how the amendment is to be accomplished."  Defendant never challenged the probation condition on this ground below; we, therefore, conclude the contention has been forfeited.  Moreover, the contention appears to be moot.  The amended tax returns defendant placed in evidence were joint returns dated March 23, 2012 and March 30, 2012, and defendant testified that he filed the amended returns within a month of their completion.

**DISPOSITION**

The judgment is affirmed.

_____

Márquez, J.

WE CONCUR:

_____

Elia, Acting P. J.

_____

Bamattre-Manoukian, J.

18