Filed 1/24/25  Save Berkeley's Neighborhoods v. Regents of Univ. of Cal. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| SAVE BERKELEY'S NEIGHBORHOODS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>REGENTS OF UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | A169722<br><br>(Alameda County Super. Ct. No. RG18902751) |

A few months after Save Berkeley's Neighborhoods filed this action to enforce the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA), the Regents of the University of California agreed to provide the primary relief sought: review of the environmental impacts of recent campus enrollment increases.  Subsequently, the trial court granted in part and denied in part Save Berkeley's attorney fee application. In this appeal, Save Berkeley contends that the trial court erred in denying attorney fees for work performed after the Regents had already agreed to the requested relief.  Save Berkeley also maintains that the trial court abused its discretion in denying its request to apply a fee enhancement in determining the amount of the award.  Because neither contention has merit, we affirm.

1

## BACKGROUND

### A.

Periodically, the University of California prepares a long-range development plan based on projected enrollment and academic goals for each campus. (*See Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226, 231 (*Save Berkeley's Neighborhoods I*); Ed. Code, § 67504, subd. (a)(1).) Under CEQA, it must analyze the environmental effects of that plan in an environmental impact report (EIR). (Pub. Resources Code, § 21080.09, subd. (b); *Save Berkeley's Neighborhoods I*, at p. 231.)

In April 2018, Save Berkeley filed a petition for writ of mandate alleging that the Regents had violated CEQA by increasing enrollment at the University of California, Berkeley campus beyond the levels projected in their last long range development plan (addressing development through 2020) without subjecting those increases to CEQA review. Save Berkeley sought an order "compelling [r]espondents to conduct environmental review of the excess increase in student enrollment pursuant to CEQA including, without limitation, by preparing and certifying an [EIR] to assess the significance of impacts caused by the excess increase in student enrollment and to identify and adopt mitigation measures to reduce these significant impacts," along with declaratory relief.

In mid-August 2018, less than four months after Save Berkeley filed suit, the Regents issued a "Notice of Preparation of a Draft Supplemental Environmental Impact Report" in connection with a proposed "Upper Hearst Development for the Goldman School of Public Policy" project. The notice recognized that "[t]he need for a [s]upplemental EIR is . . . triggered by . . . an increase in current and foreseeable campus population levels above those analyzed in the" 2020 long range development plan, "based on a general increase in student enrollment and employee

2

levels" as well as growth in the Goldman School. The notice stated that the Regents would prepare a draft supplemental EIR to "analyze whether these issues would result in new or substantially more severe significant impacts than" those analyzed in connection with the 2020 long range development plan. Further, "[u]nder CEQA, the [d]raft [s]upplemental EIR will analyze the environmental effects associated with the [Goldman School] program development on a project level and the increased campus population on a programmatic level."

The notice initiated the CEQA review process. (*See* Cal. Code Regs., tit. 14, §§ 15081-15082; *see also id.* §§ 15083-15097.) In mid-September 2018, Save Berkeley's counsel prepared a comment letter in response to the notice. In May 2019, the Regents certified the final supplemental EIR for the Goldman project. Shortly thereafter, Save Berkeley filed a second CEQA action, challenging the Goldman EIR.

**B.**

In the Goldman EIR case, Save Berkeley prevailed in the trial court. (*See Save Berkeley's Neighborhoods v. Regents of University of California* (2023) 91 Cal.App.5th 872, 879-883 (*Save Berkeley's Neighborhoods II*). The court granted Save Berkeley's petition for a writ of mandate and, among other relief, ordered the Regents to void certain decisions to increase student enrollment; " 'suspend any further increases in student enrollment at [U.C.] Berkeley' " pending compliance with the writ and the court's discharge of the writ; and revise the supplemental EIR to address legal deficiencies identified by the court and certify the revised version. (*See Save Berkeley's Neighborhoods II*, at pp. 881-883.)

But the Regents won on appeal. Another division of this court vacated the trial court's judgment based on two developments that it held rendered the case moot. (*Save Berkeley's Neighborhoods II*, *supra*, 91 Cal.App.5th at pp. 884-

3

892, 893.) First, the Regents had developed a new long-range development plan and analyzed it in yet *another* EIR. (*Id.* at pp. 884-885.) The new EIR superseded the EIR for the previous long-range development plan, and it analyzed the enrollment increases that were addressed in the Goldman EIR. (*Id.* at p. 887.)

Second, the Legislature enacted Senate Bill No. 118, which clarified that " '[e]nrollment or changes in enrollment, by themselves, do not constitute a project' for purposes of CEQA." (*Save Berkeley's Neighborhoods II*, *supra*, 91 Cal.App.5th at p. 888; *see also* Pub. Resources Code, § 21080.09, subd. (d); Sen. Bill No. 118 (2021-2022 Reg. Sess.), Stats. 2022, ch. 10, § 1, eff. March 14, 2022.) Senate Bill No. 118 also restricted the available remedies for deficiencies in environmental review of enrollment changes. (*Save Berkeley's Neighborhoods II*, at p. 888; Pub. Resources Code, § 21080.09, subd. (e).) Among other restrictions, a court may only enjoin increases in campus population exceeding those previously analyzed in an EIR if another EIR has not been certified within 18 months of the court's order. (Pub. Resources Code, § 21080.09, subd. (e)(1).) Further, "any injunction or judgment in effect as of the effective date of this subdivision suspending or otherwise affecting enrollment shall be unenforceable." (Pub. Resources Code, § 21080.09, subd. (e)(2).)

*Save Berkeley's Neighborhoods II* held that "the plain language of the statute renders unenforceable the trial court's order voiding any decisions by the Regents to increase student enrollment and suspending any further increases in student enrollment." (*Save Berkeley's Neighborhoods II*, *supra*, 91 Cal.App.5th at pp. 891-892.) In addition, because the Regents had already prepared an EIR consistent with the requirements in Public Resources Code section 21080.09, subdivision (e)(1), the statute prevents a court from granting any further relief. (*Save Berkeley's Neighborhoods II*, at p. 892.) Accordingly, the court

4

could not grant effective relief, and the Goldman EIR case was dismissed as moot. (*Id.*, at pp. 892-893.)

## C.

Meanwhile, the litigation of the enrollment case proceeded in parallel with the Goldman EIR case. The trial court granted a demurrer by the Regents, which Save Berkeley overturned on appeal. (*Save Berkeley's Neighborhoods I, supra*, 51 Cal.App.5th at p. 234.) The parties also engaged in discovery. At some point, the trial court stayed the enrollment case in light of the Goldman EIR case. When the latter case was dismissed as moot, the court dismissed the enrollment case as moot, too.

Save Berkeley then filed a petition in the enrollment case requesting over $1.4 million in attorney fees. Its petition sought fees not only for work performed in the enrollment case but also for the Goldman EIR case. Save Berkeley argued that its efforts in the Goldman EIR case were " 'inextricably intertwined' " with the enrollment case and contributed to achieving its objectives.

The trial court granted the petition in part, concluding that Save Berkeley was entitled to fees because its writ petition had led the Regents to issue the notice committing to analyze the enrollment increases under CEQA, thus providing the primary relief sought in the enrollment case. The court awarded a total of $75,961.50 in fees, which included compensation for work performed through mid-September 2018, when Save Berkeley's counsel drafted a comment letter on the notice.

The court found that the fees incurred after mid-September 2018 "were not reasonably incurred," however, because the Regents had already agreed to provide the requested relief when they issued the notice. The trial court found that "the continued litigation" after that point "did nothing to further the benefits of the" notice and that the "further litigation was ultimately unsuccessful and any benefits mooted."

5

In addition, the court denied fees for work performed in the Goldman EIR case. Save Berkeley filed the case after the Regents had already committed, in the notice, to provide the primary relief requested in the enrollment case. Moreover, because the case was dismissed as moot after the Legislature changed the law, Save Berkeley did not succeed in the litigation or obtain any public benefit.

Finally, the trial court concluded that a fee enhancement was not warranted because the issues prior to the notice were not complex; the risk of non-payment was lessened because Save Berkeley's counsel billed at a reduced rate, so the case was only partially contingent; and the relief obtained was "limited."

## DISCUSSION

### A.

Code of Civil Procedure section 1021.5[1] authorizes courts to award attorney fees to a "successful party" whose litigation efforts have enforced "an important right affecting the public interest." Attorney fees may be awarded if "(a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, . . . , are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (§ 1021.5.) The goal of the statute is to encourage suits that enforce significant public policies. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 565 (*Graham*).)

To establish that a fee applicant is a "successful party" under section 1021.5, the applicant need not obtain a favorable court judgment. (*Graham, supra,* 34 Cal.4th at p. 560.) Under

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

6

the catalyst theory relied on by Save Berkeley, a party may obtain fees when the litigation obtained the primary relief sought by causing a voluntary change in the defendant's behavior. (*Ibid.*; *see also Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 352-353 (*Westside Community*).) The catalyst theory conserves court resources " 'by encouraging "plaintiffs to discontinue litigation" ' " once the defendant has agreed to provide the requested relief. (*Graham*, at p. 573, quoting *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources* (2001) 532 U.S. 598, 640 (dis. opn. of Ginsburg, J.).)

We review the trial court's decision for abuse of discretion, and we will reverse only if we find no reasonable basis for the court's conclusion. (*Skinner v. Ken's Foods, Inc.* (2020) 53 Cal.App.5th 938, 946.)

**B.**

Save Berkeley argues that the trial court abused its discretion in denying it fees incurred after mid-September 2018, when Save Berkeley completed its comment letter on the notice for the Goldman EIR. We disagree.

The trial court found that Save Berkeley prevailed on one litigation objective: obtaining a CEQA analysis of the University's past enrollment increases. The Regents agreed to provide that analysis when it announced, in the notice, that it would do so. Nothing that Save Berkeley did thereafter, in the trial court's view, produced any (lasting) success or public benefit, given the change in law and other circumstances that left the two cases moot. Accordingly, the court significantly reduced the request based on a pragmatic assessment of Save Berkeley's limited success.

Although Save Berkeley argues otherwise, the trial court's decision rests on well-settled law. A court must determine the

7

fee award based on its practical assessment of the relationship between the work performed and the relief obtained. (*See Save Our Uniquely Rural Community Environment v. County of San Bernardino* (2015) 235 Cal.App.4th 1179, 1185.) The plaintiff must show a causal connection between its efforts and a public benefit. (*See Ciani v. San Diego Trust & Savings Bank* (1994) 25 Cal.App.4th 563, 577 (*Ciani*); *Westside Community*, *supra*, 33 Cal.3d at p. 353.) A court may reduce a fee award where " ' "the relief, however significant, is limited in comparison to the scope of the litigation as a whole." ' " (*Save Our Uniquely Rural Community Environment v. County of San Bernardino,* at p. 1185, quoting *Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 248; *see also, e.g.*, *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217, 239.) The trial court's analysis falls well within its discretion.

None of Save Berkeley's arguments has merit.

First, Save Berkeley makes a confusing argument that the trial court applied the wrong legal standard for determining *when* it became a successful party. Save Berkeley says that, because the notice was merely an unenforceable promise to analyze the enrollment increases, it provided no benefit to the public. The public benefit came months later when the Regents completed the Goldman EIR, which contained the environmental analysis. Therefore, Save Berkeley says, it is entitled to its attorney fees for the time between the notice and the completion of the EIR.

We disagree. The notice marked the point in time when the Regents *voluntarily changed their behavior* by agreeing to give Save Berkeley the primary relief it sought in its lawsuit (the analysis of past enrollment increases)—which is a requirement for being a "successful party" under this version of the catalyst theory. (§ 1021.5; *Graham*, *supra*, 34 Cal.4th at pp. 571-572.)

8

The subsequent CEQA process—which culminated in an EIR—implemented that change and ultimately resulted in a significant public benefit. (§ 1021.5) We do not see why a plaintiff is automatically entitled to attorney fees after a defendant has agreed to change its position simply because the change requires time and a public process to implement. Unless the defendant's commitment to change is insincere, the plaintiff is pushing on an open door. (*Cf. Graham*, at p. 573 [catalyst rule encourages plaintiffs " ' "to discontinue litigation after receiving through the defendant's acquiescence the remedy initially sought" ' "]; *see also Westside Community*, *supra*, 33 Cal.3d at pp. 353-354 [concluding that the plaintiffs' litigation efforts did not cause an agency to issue final regulations where the agency had initiated the rule-making process before the suit was filed].)

The question is whether Save Berkeley's litigation efforts (after the notice was issued) actually accomplished anything. (*Ciani*, *supra*, 25 Cal.App.4th at p. 577 [denying attorney fees incurred by plaintiff in collateral proceeding where plaintiff failed to show its efforts in that proceeding made any difference]; *see Westside Community*, *supra*, 33 Cal.3d at pp. 353-354.) Save Berkeley might have been entitled to more fees if it had established, for example, that the Regents would have abandoned their commitment to do the analysis except for the fact that Save Berkeley held their feet to the fire. The trial court's finding to the contrary, however, was supported by substantial evidence.

Save Berkeley contends that, after issuing the notice, the Regents drew out the litigation by pursuing demurrers. The Regents counter that Save Berkeley should have sought a stay. We conclude that these are matters for the trial court's discretion. (*See, e.g., Skinner*, *supra*, 53 Cal.App.5th at pp. 946, 951.)

Save Berkeley points to the Regents' various arguments throughout both cases that CEQA did not *require* them to analyze

9

the enrollment increases in the Goldman EIR and the increases were technically not part of the Goldman project; they thereby sought to get credit for doing the analysis without having to defend its merits. It is true that the Regents did engage in cakeism of this sort, and Save Berkeley essentially prevailed in court on these points. (*See Save Berkeley's Neighborhoods I, supra*, 51 Cal.App.5th at pp. 233-234; *Save Berkeley's Neighborhoods II, supra*, 91 Cal.App.5th at pp. 880-881.) But with respect to fees, the trial court found that the EIR itself—the analysis of the enrollment increases in a public process—was the public benefit. The Regents' subsequent litigation positions neither added to nor subtracted from it. (See *Ciani, supra*, 25 Cal.App.4th at p. 576 ["That [public] benefit arose and was complete regardless of subsequent proceedings."].) In any event, Save Berkeley only won a pyrrhic victory as to the Regents' litigation positions. The cases were dismissed as moot after the Legislature changed the law. (*See Save Berkeley's Neighborhoods II, supra,* 91 Cal.App.5th at p. 888; *see also,* Pub. Resources Code, § 21080.09, subd. (d); Sen. Bill No. 118 (2021-2022 Reg. Sess.), Stats. 2022, ch. 10, § 1, eff. March 14, 2022.) The trial court did not abuse its discretion when it determined that the balance of Save Berkeley's efforts, through no fault of its own, yielded no benefit to the public.

Likewise, the trial court was not required to determine whether Save Berkeley was entitled to its attorney fees for the Goldman EIR case on the theory that it was " 'inextricably intertwined' " with the enrollment case. When a party successfully obtains public benefits in one case, it is not entitled to attorney fees from collateral litigation unless it demonstrates a causal link between its efforts in the collateral matter and the public benefits. (*Ciani, supra*, 25 Cal.App.4th at pp. 575-577.) Here, however, all of Save Berkeley's efforts in the Goldman EIR litigation occurred *after* it had already secured the completion of

10

the Goldman EIR; its efforts in the Goldman EIR case bore no causal connection to the benefit obtained.

## C.

Contrary to Save Berkeley's contention, the trial court did not abuse its discretion in declining to award a fee enhancement. In determining the amount of attorney fees, the trial court may award a fee enhancement or multiplier based on factors including the novelty and difficulty of the issues, the skill displayed by counsel, the opportunity cost to counsel of taking the case, and the risk of non-payment borne by counsel. (*Graham*, *supra*, 34 Cal.4th at p. 579, citing *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131-1132.) A fact intensive question, the determination as to whether a multiplier is appropriate in a given case is entrusted to the trial court's discretion. (*Id.* at p. 581.)

First, Save Berkeley maintains that a multiplier is warranted because the issues "involved complex questions of law that required interlocutory intervention" in *Save Berkeley's Neighborhood I* as well as litigation in both cases in response to the Regents' legal strategy. However, Save Berkeley's argument relates to work performed after the completion of public comment on the notice. As a result, this argument fails for the same reasons explained above. Further, the question whether the Regents had a duty to analyze enrollment increases under CEQA was not complex: it involved "a routine application of basic CEQA requirements." (*Save Berkeley's Neighborhoods I*, *supra*, 51 Cal.App.5th at p. 237.)

Second, Save Berkeley asserts that a multiplier is appropriate because the result obtained here was "excellent and important." Although causing the Regents to conduct the CEQA analysis was an important and worthy goal, the trial court could reasonably have concluded that the results were mixed. Because the Legislature effectively mooted the cases, the courts never finally determined whether the University's analysis complied

11

with CEQA.  Indeed, Save Berkeley's litigation prompted the Legislature to weaken the enforcement mechanisms for CEQA review of enrollment increases.  (*See Save Berkeley's Neighborhoods II*, *supra*, 91 Cal.App.5th at pp. 888, 891-892; Sen. Com. on Budget and Fiscal Review, Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 118 (2021-2022 Reg. Sess.) as amended March 11, 2022, p. 2.)

Third, Save Berkeley contends that a multiplier is warranted based on its counsel's partial contingency risk alone. Even though the trial court could have exercised its discretion to award a multiplier based on this factor, the "court is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk."  (*Ketchum v. Moses*, *supra*, 24 Cal.4th at p. 1138.)  Here, the risk of non-payment was reduced not only because the contingency was partial, but because, as discussed, the basic legal duty the lawsuit sought to enforce was not novel. (*See Save Berkeley's Neighborhoods I*, *supra*, 51 Cal.App.5th at p. 237.)  Less risky litigation warrants a lower multiplier, "if one is given at all."  (*Graham*, *supra*, 34 Cal.4th at p. 583.)  We therefore find no abuse of discretion in the court's decision not to award a multiplier here.  (*See Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 741 [affirming trial court's decision not to award multiplier where counsel took the case on a partial contingency basis].)

## DISPOSITION

The judgment is affirmed.

BURNS, J.

WE CONCUR:

SIMONS, ACTING P.J.
CHOU, J.
*Save Berkeley's Neighborhoods v. Regents of University of California (A169722)*

12